NEW HAVEN & DERBY RAILROAD CO. *vs.* JOHN G. CHAPMAN.
SAME *vs.* JAMES BARKER.

The plaintiffs, a railroad company, were incorporated with a capital of $500,000, with power "to call the first meeting of the stockholders whenever $100,000 or more of the capital stock shall have been subscribed for, to choose directors and perfect the organization of said corporation," and "when so organized to proceed to commence the construction of the railroad."

The sum of $216,700 was subscribed, including the subscriptions of the defendants, and the first meeting of the stockholders was then held and directors

New Haven & Derby R. R. Co. *v.* Chapman.

chosen. Subsequently an amendment to the plaintiffs' charter was passed by the General Assembly, authorizing the city of *N. H.* to subscribe $200,000 to the capital stock, and to appoint two directors in the company, with one vote for every four shares of stock held by the city. Pursuant to the power so given, the city of *N. H.* subscribed $200,000 to the stock, and appointed two directors who assumed and continued to discharge the duties of the office.

No other subscriptions were made, and the directors thereupon proceeded to call in the capital stock, and to commence the construction of the railroad.

In an action to recover subscriptions to the stock, Held, 1. That the term "organize," as used in the charter, embraced merely the choice by the stockholders of the necessary officers for the transaction of the business of the company, and that the plaintiffs, when so organized, $100,000 having been subscribed to the stock, might legally begin the exercise of their corporate franchise. 2. That the amendment to the charter, and the action of the plaintiffs and the city under it, did not impair the rights of the defendants as stockholders, or relieve them from liability on their subscription.

ASSUMPSIT to recover for subscriptions to the capital stock of the plaintiffs, brought to the Court of Common Pleas in New Haven county. On the trial to the court on the general issue with notice, the court, (*Bronson, J.,*) found the following facts, and reserved the cases for the advice of this court.

The two cases involved the same principle, and were argued together.

The plaintiffs were incorporated by the legislature of the state of Connecticut, at its May session, A. D. 1864, with the powers embraced in their charter. (Priv. Acts of 1864, 188, 189, 190, 191.)

Upon the petition of the city of New Haven, the legislature at its May session, A. D. 1867, passed a resolution authorizing the city of New Haven to subscribe to the capital stock of the company, (Priv. Acts of 1867, 48, 49, 50;) the plaintiffs were not petitioners therefor; but the attorney of the company with the knowledge of all the persons constituting the board of directors, aided in the prosecution of the petition, and in a hearing thereof before a committee of the General Assembly, and was subsequently paid for his services by the company. There was no vote of the board or of the corporation authorizing said services, but the president of the company and a majority in number of the directors were present, aiding and assisting the attorney in the prosecu-

tion of the petition—acting, however without corporate vote or vote of the board in that behalf.

Upon petition of the city of New Haven, a public act was passed by the legislature, at its May session, A. D. 1869; (Acts of 1869, 232, 233,) and the recital or whereas clause, preceding the enacting clause of said public act, is in fact true.

The resolution passed at the May session of the General Assembly, 1867, herein before mentioned, was approved by a vote of the freemen of the city of New Haven on the 17th day of June, A. D. 1867, at a meeting called for that purpose by the court of common council of the city; after such approval the city of New Haven did, on the 20th day of June, A. D. 1867, subscribe for and take two thousand shares of the capital stock of the company, which stock has been paid for in full by the city.

After the city made said subscription and payment, the city voted and participated by its mayor, or other agent, in all the meetings of the stockholders of the company, in manner as prescribed in the third section of said resolution, and, particularly voted for the election of directors at the annual meetings of stockholders, held in the years 1867, 1868, 1869 and 1870, and, also participated in sundry special meetings of the stockholders of the company, held in each of said years respectively, at which business of vital importance to the company was transacted, and upon which the city voted by its mayor or agent as aforesaid.

The mayor of the city for the time being, and one of the aldermen annually designated by the court of common council for that purpose, acted as directors of the railroad company in all the meetings of the board of directors held since the date of said subscription, to wit, since the 20th day of June, A. D. 1867, claiming authority to so act, by virtue of the third section of said resolution, and by virtue of no other appointment to the office of director whatsoever; and they have never been elected to the office of director by the stockholders, or in any other way appointed to said office.

The mayor and alderman so designated, voted and acted

upon important business of the company transacted in the meetings of the board; and acted upon important committees of the board, to which business vitally affecting the interests of the road was referred, at times presided *pro tem.* at meetings of the board, and have been, in all respects, as active and potential in the transaction of the business of the board, and in the management and direction of the affairs of the company, as the other directors have been.

The railroad company has never accepted by any vote, resolution, or action of its stockholders in any stockholders' meeting, or of its board of directors, the resolution of 1867, as an amendment to its charter, but has acted as if the same were a valid amendment to its charter; and the city of New Haven has acted as if the same were a valid amendment to the charter of the city; and the mayor and alderman have also so acted, in claiming to be, and in acting as, directors of the company.

The stockholders of the company had no opportunity to participate in the election of the mayor and alderman as city directors, but to vote only for a number of directors less by two than they otherwise would or could have voted for; the defendant, Chapman, has never acquiesced in the appointment of the city directors, and has claimed that they were not legally appointed members of the board of directors.

The defendants, though freemen of the city of New Haven at the time said resolution was approved by vote of the freemen of the city, did not vote upon the question of approval or disapproval. The company made ten calls, of ten per cent. each, on the stock subscriptions to its capital, payable respectively, and in that order, on the 15th days of May and June in the year 1867, and on the 15th days of January, February, March, May, June, July, August and September, in the year 1868; the defendant Chapman paid the first two installments so called for, on the days they respectively fell due, to wit, on the 15th days of May and June in the year 1867, but refused to pay all the other installments; he has never participated in any stockholders' meeting of the company, or held any office therein since its organization, and did not know, at the

time he paid said two stock installments, that the capital stock of the company had not been fully subscribed for.

The plaintiffs obtained, before the 24th day of April, A. D. 1867, sundry subscriptions to their capital stock, among which are the subscription of the defendants; and, on the last mentioned day, the company, in first meeting of stockholders, elected a board of directors, and perfected their organization, having at that time subscriptions to their capital stock of two hundred and sixteen thousand and seven hundred dollars; the city of New Haven afterwards subscribed, as hereinbefore mentioned, on the 20th day of June, A. D. 1867, two hundred thousand dollars to their capital stock, and the total amount of subscriptions to the capital stock of the company is still considerably, substantially and materially short of five hundred thousand dollars.

In November, A. D. 1867, the plaintiffs, by their directors, said mayor and alderman acting with the board, put its road under contract for construction throughout its entire length; large sums of money have been expended in the work of construction, and further large sums will be required for the completion of said railroad; the company has issued bonds to a large amount, and secured the same by a first mortgage on all its property, except certain property contained in a second mortgage, hereinafter mentioned; a large amount of the first mortgage bonds has been already expended in the construction of the railroad; and an additional amount of the bonds will be issued, and expended in the completion and equipment of the road. The company has also made and executed, under and in pursuance of said public act of 1869, its further bonds to a large amount, which have been guaranteed by the city of New Haven, and are called guarantee bonds; to secure and indemnify the city for which guarantee, the company created a second mortgage on all the property of the company included in said first mortgage, and also on other property of the company, consisting of lands and buildings in the city of New Haven, which is not included in said first mortgage; the last mentioned

mortgage is a first mortgage upon said lands and buildings in the city of New Haven, and a second mortgage upon all other property of the company ; a large amount of guarantee bonds has already been expended in the construction of the railroad, and an additional amount will be so issued and expended. The total cost of the railroad, when completed and equipped, will considerably exceed the sum of five hundred thousand dollars ; the two mortgages before mentioned taken together, now are and will be at the time of the completion of the road, larger in amount, by the sum of eighty-three thousand and three hundred dollars, than they would have been if subscriptions to the capital stock of the company to the amount of five hundred thousand dollars, had been obtained and paid.

The defendant Chapman subscribed two shares, of one hundred dollars each, to the stock of the company ; on which eight installments of twenty dollars each are due and unpaid.

In addition to the foregoing facts, the court found the following facts in the suit against Barker :

The defendant, in March, A. D. 1867, subscribed for three shares of the capital stock of the company, of one hundred dollars each, paid the first installment called for on the day the same became due, to wit, on the 15th day of May, A. D. 1867, paid the second installment called for on the 30th day of September, A. D. 1867, and has since paid no other installments. He participated in the stockholders' meetings of the company, after the city subscription to the capital stock of the company, with knowledge that the resolution authorizing said subscription had been passed by the legislature and approved by a vote of the freemen of the city; and he had such knowledge at the time he paid the second installment, on the 30th day of September, 1867.

*H. B. Harrison,* for the plaintiff, cited *Starr* v. *Pease,* 8 Conn., 541 ; *Pratt* v. *Allen,* 13 id., 119 ; *Northern R. R. Co.* v. *Miller,* 10 Barb., 260 ; *Buffalo & N. Y. City R. R. Co.* v. *Dudley,* 14 N. Y., 336 ; *In re Oliver Lee's Bank,* 21 id., 20, 21 ; *Meadow Dam Co.* v. *Gray,* 30 Maine, 549 ; *Agricul-*

*tural Branch .R. R. Co.* v. *Winchester,* 13 Allen, 29 ; *Pacific R. R. Co.* v. *Renshaw,* 18 Mo., 210 ; *Midland Railway Co.* v. *Gordon,* 16 Mees. & W., 804 ; Angell & Ames on Corp., ch. 2, sec. 7 ; Gen. Stat., tit. 7, ch. 7, § 443 *et seq.,* ch. 6, § 240 ; *Schenectady & Saratoga Plank Road Co.* v. *Thatcher,* 11 N. Y., 102 ; *Burlington & Missouri River R. R. Co.* v. *White,* 5 Iowa, 409 ; *Sparrow.* v. *Evansville & Crawfordsville R. R. Co.,* 7 Ind., 369 ; *Barret* v. *Alton & Sangamon R. R. Co.,* 13 Ill., 504.

*Wright* and *Watrous,* for the defendants.

1. The plaintiffs cannot prevail against the defendants, because the whole capital of $500,000 required by the charter had not been subscribed when the installments sought · to be recovered were laid : nor has the same since been subscribed.

Gen. Stat., 487, § 12 ; 170, § 393 *et seq. ;* 141 ; Angell & Ames on Corp., §§ 110, 556 ; Redfield on Railways, ch. 4, sec. 1, § 18 ; ch. 3, sec. 3, § 65 ; *Anderson* v. *Newcastle & Richmond R. R. Co.,* 12 Ind., 376 ; *Matty* v. *Northwestern Virginia R. R. Co.,* 16 Md., 422 ; Redfield on Railways, ch. 4, sec. 1, § 18, (2,) (6.) *Walker* v. *Devereaux,* 4 Paige, 239 ; *Hartford & New Haven R. R. Co.* v. *Kennedy,* 12 Conn., 499 ; *Shurtz* v. *Schoolcraft & Three Rivers R. R. Co.,* 9 Mich., 272 ; *Salem Mill Dam Co.* v. *Ropes,* 6 Pick., 23 ; S. C., 9 Pick., 187 ; *Stoneham Branch R. R. Co.* v. *Gould,* 2 Gray, 277 ; *Troy & Greenfield R. R. Co.* v. *Newton,* 8 Gray, 596, 602, 603 ; *New Hampshire Central R. R. Co.* v. *Johnson,* 10 N. H., 390, 407 ; *Cabot & West Springfield Bridge Co.* v. *Chapin,* 6 Cush., 52 ; *Lewey's Island R. R. Co.* v. *Bolton,* 48 Maine, 455 ; *Oldtown & Lincoln R. R. Co.* v. *Veazie,* 39 id., 571 ; *Penobscot R. R. Co.* v. *White,* 41 id., 512 ; *Peoples' Ferry Co.* v. *Balch,* 8 Gray, 303, 311 ; *Atlantic Cotton Mills* v. *Abbott,* 9 Cush., 423, 426 ; Redfield on Railways, ch. 4, sec. 1, § 18, (2,) note 3 ; ch. 9, sec. 5, § 51, *et seq* ; ch. 7, sec. 1, § 30, (1); *Nutter* v. *Lexington & West Cambridge R. R. Co.,* 6 Gray, 88 ; *Central Turnpike Co.* v. *Valentine,* 10 Pick., 142 ; *Lexington & West Cambridge R. R. Co.* v. *Chan-*

*dler*, 13 Met., 311; *White Mountains R. R. Co.* v. *Eastman*, 34 N. H., 145; *Schenectady & Saratoga Plank Road Co.* v. *Thacher*, 1 Kernan, 107; Angell & Ames on Corp., § 543; *Mann* v. *Cook*, 20 Conn., 178; *Brown* v. *Illius*, 27 id., 84; *New York & New Haven R. R. Co.* v. *Ketchum*, id., 170; Angell & Ames on Corp., § 542; *Danbury & Norwalk R. R. Co.* v. *Wilson*, 22 Conn., 449; *Lane* v. *Brainerd*, 30 id., 565; *Marlborough Manufacturing Co.* v. *Smith*, 2 id., 579; *Hepburn* v. *Griswold*, 8 Wallace, 607; *Contoocook Valley R. R.* v. *Baker*, 32 *N. H.*, 369–372; Redfield on Railways, ch. 9, § 51, (3); *Wontner* v. *Shairp*, 4 Man., Grang. & Scott, 404, 441; *Pritchford* v. *Davis*, 5 Mees. & W., 2; *Howbeach Coal Co.* v. *Teague*, 5 Hurl. & Norm., 151; *McCully* v. *Pittsburgh & Connellsville R. R. Co.*, 32 Penn. St. R., 25, 31, 32; *Pittsburgh & Connellsville R. R. Co.* v. *Graham*, 36 id., 77; *Commonwealth* v. *Cullen*, 13 id., 133, 141–144.

2. Any change or alteration of the charter after subscription to the stock, which fundamentally varies the character, structure, or purposes of the corporation, or the manner of accomplishing those purposes, is a change in the contract of subscription, which releases the subscriber from his obligation to take and pay for the stock subscribed for, notwithstanding a reservation of power to alter or amend the charter.

*Hamilton Mut. Ins. Co.* v. *Hobart*, 2 Gray, 548; *Oldtown & Lincoln R. R. Co.* v. *Veazie*, 39 Maine, 571, 581; *Commonwealth* v. *Essex Co.*, 13 Gray, 253; *Allen* v. *McKeen*, 1 Summer, 276; Angell & Ames on Corp., § 767, 536, 537, 541; *Thompson* v. *Guion*, 5 Jones Eq., 113; *McCray* v. *Junction R. R. Co.*, 9 *Ind.*, 358; *Marietta & Cincinnati R. R. Co.* v. *Elliott*, 10 Ohio St. R., 57, 62; *Barnes* v. *Smith*, 10 N. Y., 550; *Troy & Rutland R. R. Co.* v. *Kerr*, 17 Barb., 604; *Kenosha, Rockford & Rock Island R. R. Co.* v. *Marsh*, 17 Wis., 143; *Sage* v. *Dillard*, 15 B. Monroe, 341, 348–360; *Booe* v. *Junction R. R. Co.*, 10 Ind., 93; *Zabriskie* v. *Hackensack & New York R. R. Co.*, 18 N. J. Eq., 178; *Delaware R. R. Co.* v. *Thorp*, 5 Del., 454; *Woodruff* v. *The State*, 3 Ark., 285; *Herrick* v. *Town of Randolph*, 13 Verm., 525; *Everhart* v. *West Chester & Philadelphia R. R. Co.*, 28 Penn.

St. R., 339, 352, 353; *Hartford & New Haven R. R. Co.* v. *Croswell,* 5 Hill, 383; *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat., 518; *Sheriff* v. *Lowndes,* 16 Md., 357; *Norris* v. *Trustees of Abingdon Academy,* 7 Gill & Johns.; 7; *Regents of University of Maryland* v. *Williams,* 9 id., 366, 413; *Town of Yarmouth* v. *Town of North Yarmouth,* 34 id., 411; *Trustees of New Gloucester School Fund* v. *Bradbury,* 11 id., 118; *City of Louisville* v. *President & Trustees of the University of Louisville,* 15 B. Monroe, 667; *Commonwealth* v. *Cullen,* 13 Penn. St. R., 133; *Brown* v. *Hummel,* 6 id., 86; *Ellis* v. *Marshall,* 2 Mass., 277.

CARPENTER, J.   The plaintiffs were incorporated with a capital of $500,000, with power to call a meeting of the stockholders to choose directors and perfect the organization of the company, whenever the sum of $100,000 should be subscribed to the capital stock.   The sum of $216,700 was subscribed, when the first meeting of the stockholders was held, and directors chosen.   Subsequently the city of New Haven having received authority so to do, subscribed the sum of $200,000 more.   No other subscriptions were ever made, leaving the sum of $83,300 unsubscribed for.   The directors thereupon proceeded to call in the capital stock thus subscribed, and to commence the construction of the proposed railway.

The defendant Chapman subscribed for two shares of said stock; and the defendant Barker for three shares.   Each of the defendants paid two installments of ten per cent. each, leaving the remaining eighty per cent. due and unpaid.   These actions are brought to recover the balance with interest.

The first ground of defence is that the whole capital of $500,000 has not been subscribed for.

There can be no doubt that the policy of the state, up to comparatively a recent period, has been, in corporations of this character, to require that an adequate cash capital for the undertaking should be furnished, before corporations should be permitted to exercise their corporate functions.   Hence, in most of the charters hitherto granted, there is no authority for the stockholders to meet and choose directors before all

the stock is subscribed. But in the charter before us there is a provision which seems to indicate the inauguration of a different policy. That provision is as follows: "The persons named in the first section hereof, or a majority of them, are hereby authorized to call the first meeting of the stockholders of said corporation, in such way, and at such time and place, as they may appoint, whenever one hundred thousand dollars or more of the capital stock of said corporation shall have been subscribed for, to choose directors and perfect the organization of said corporation." Private Acts, vol. 5, p. 653, sec. 4.

To what extent the legislature intended to change their antecedent policy, is really the question involved. The defendants contend that they only intended, after a certain amount of the capital stock should have been subscribed, to transfer the superintendence of further subscriptions to the stock from the corporators to the directors; and that it was the duty of the directors to fill up the stock, before they could lawfully proceed with the business for which the corporation was created. The plaintiffs, on the other hand, contend that the change contemplated was much more radical,—that they intended not only to authorize a meeting for the choice of directors, but that the corporation should at once possess all its powers and franchises, and might immediately proceed with the construction of its road.

The language of the charter seems to import much more than the defendants claim. The phrase, "to choose directors and perfect the organization of said corporation," in its grammatical construction, obviously relates to the meeting of the stockholders. If interpreted according to its grammatical construction, therefore, it was for that meeting to perfect the organization, as well as to choose directors. We can hardly suppose that the legislature intended that that meeting should then and there fill up the stock, much less can we suppose that they intended that the meeting should continue in session, or otherwise prolong its existence, for that purpose. We all know that such a course would have been impracticable. If the language used, therefore, is to be taken in its ordinary grammatical sense, we think it quite clear that they could not

have intended, by "perfecting the organization," the filling up of the capital stock.

If the legislature intended that the directors, when chosen, should perfect the organization by procuring the balance of the stock to be subscribed for, they were certainly unfortunate in the choice of language to express that intention. If the words, "perfect the organization," relate to the directors at all, it seems reasonable to interpret them as referring to the duty of the directors to choose a president, and to make and prescribe by-laws; or to their power to choose a clerk and treasurer and other officers; for these are duties and powers usually performed and exercised by directors; and perhaps we could, without doing violence to the language used, give these words that meaning. While it is only by a forced and unnatural construction, that we can limit and apply them simply to the matter of procuring further subscriptions to the stock.

We see no difficulty however in interpreting them as referring to the stockholders' meeting. If so interpreted they may mean substantially the same thing as choosing directors, embracing such matters as are incidental to, and implied from, the power to choose directors, such as appointing a chairman, clerk, and tellers, and prescribing rules and regulations for governing their proceedings, and the like. Or they may, and more properly perhaps, refer to the appointment of such officers as are not by law required to be chosen by the directors, such as the vice-presidents, an executive committee, a clerk or secretary, a treasurer, agents and other officers. It is true some, and perhaps all of these, may be chosen by the directors. The statute authorizes them to choose a clerk and treasurer, but it is not imperative, as in the case of the president. See Gen. Stat., p. 181, sec. 444. There is certainly some room for the inference that all these officers may be chosen by the stockholders. If so, the words under consideration may properly apply to such proceedings.

The word "organize," as used in railroad and other charters, ordinarily signifies the choice and qualification of all necessary officers for the transaction of the business of the corporation. This is usually done after all the capital stock has been sub-

scribed for.   I have been unable to find any case in which it
necessarily includes in its meaning the procuring of subscrip-
tions to the capital stock ; but I do find cases where manifest-
ly it is not used in any such sense.   The corporators of the
Boston, Hartford & Erie Railroad Company were authorized to
*organize* the company when one-half the stock required should
be subscribed.   Private Acts, vol. 5, p. 543.   See also Act
amending the charter of the Fairfield County Railroad Com-
pany, vol. 4, p. 887.

Again, if the construction contended for by the defendants
is the correct one, what is gained by this unusual and extra-
ordinary provision ?   Can it be claimed that the directors,
after a partial organization, will be more successful in obtain-
ing subscriptions than the corporators were before ?   According
to their construction, the corporation cannot exist, no corpo-
rate act can be done, the object of its creation cannot be ac-
complished, the enterprise contemplated cannot be commenced
even, until the whole stock is subscribed for.   The practical
operation of this section, as thus construed, would be simply
to take from one set of men the burden of procuring subscrip-
tions, and impose it upon another.   Or, quite likely, it would
be taking it from one set of men as corporators, and imposing
it upon the same men as directors.   In all this we discover
nothing gained either to the corporation or the public.

On the other hand, considering the difficulty of procuring,
in the first instance, the necessary means for the construction
of railroads, combined with the necessity and importance of
their construction, in order that the resources of the various
sections of the state may be more fully developed, we can
discover a motive which may have induced the legislature to
change, to some extent, their policy in this respect, and to
authorize the promoters of such enterprises to commence their
corporate existence, and the exercise of the powers and fran-
chises conferred upon them, with only a part of the capital
stock required subscribed for.

That this must have been the intention of the legislature,
will appear more clearly from a comparison of the last clause
of the 4th section with other provisions in the charter.   "And

whenever said corporation shall have been so organized, it may proceed to commence the construction of the railroad hereinafter specified." How organized? The defendants say, with the capital stock all subscribed for. If so, what necessity for this provision at all? The 6th section provides as follows: "Said corporation is hereby authorized and empowered to locate, construct, and finally complete, a single, double, or treble railroad or way" &c. from New Haven to Derby.

Here then is authority full and ample, which renders the last clause of the 4th section nugatory. Now if we are to construe this charter so as to give effect to all its provisions, we must reject this construction. Moreover, the language of this 4th section is peculiar. It is not that the corporation may proceed from its organization to the construction of its railroad, but it is that it may proceed to *commence* the construction. This is a strong indication that the legislature intended that the work might be commenced with a limited capital, and continued subsequently as the corporation might obtain the necessary means. We say nothing of course as to the expediency of such a policy. That was a question entirely for the legislature. Our duty is to ascertain what they intended, and to give effect to that intention.

A question may arise in respect to some of these charters, more properly perhaps in a court of equity, whether the corporation should be permitted to go forward and expend the money subscribed, when it is manifest that the work cannot be completed, and that the money expended will be lost. No such question arises in the present case. More than four-fifths of the stock required was actually subscribed for, and the work has been carried forward nearly, or quite, to completion.

We are satisfied therefore that these proceedings of the corporation were not illegal, and that this branch of the defence cannot be sustained.

The defendants further claim that the Act of 1867, authorizing the city of New Haven to subscribe for two thousand shares of the stock, and the proceedings of the city and the plaintiffs under said Act, operate to discharge the defendants from the obligation of their contracts.

The Act authorizing said subscription provides that the mayor of said city, and one of the aldermen to be designated by the common council, shall each be, by virtue of his office, and while said city shall continue to be a stockholder, a director in the railroad company; and that said city shall be entitled to one vote only for every four shares of stock by it owned. In every other respect the stock held by the city is held upon the same terms and conditions as that held by other stockholders.

Before discussing the legal questions involved in this part of the case, it may be well to consider briefly what effect these proceedings have, or have had, upon the rights and interests of the defendants. Are they prejudicial, or otherwise? It is not found that either of the defendants has thereby sustained any actual pecuniary damage. In looking at the case as stated, we think it will be found that the whole injury consists in the fact that the defendants are deprived of the privilege of voting for two of the directors. The statute requires that there shall be not less than nine directors; there may be more at the discretion of the stockholders. The stockholders therefore elect seven out of the nine directors, and are deprived of the privilege of voting for the other two. On the other hand the city is prohibited from voting on three-fourths of its stock. In consideration of the privilege of electing two directors, the city agrees that, in all meetings of the stockholders, it will cast but five hundred votes, instead of two thousand. The whole number of shares subscribed is 4,167. The city subscribed 2,000. The balance, much of it at least, is probably owned in small sums, and by individuals who take little interest in attending the meetings of the stockholders. Thus it will be readily seen that the city, if entitled to one vote on each share of its stock, could exercise a controlling influence in all the meetings of the corporation, and would, if so disposed, elect the whole board of directors. To avoid this the provision under consideration was adopted. The practical effect of it is to give to fifteen hundred shares, being more than one-third of the entire stock, two-ninths of the directors absolutely, at the same time depriving it of all

voting power in the meetings of the stockholders. We cannot say that this is unreasonable. It is manifestly for the advantage of the corporation that its affairs should not be virtually controlled by the city. On the other hand it is just that the city should have a voice in its management. The arrangement seems to us just and reasonable, and, on the whole, beneficial, rather than prejudicial, to the defendants.

The ground of this objection is that the defendants, by their contracts of subscription, acquired certain rights and privileges, of which they have been divested by the amendments to the charter. The contract entitled each defendant to the number of shares subscribed for by him, and obligated him to pay to the corporation the par value of the stock. It also contained an agreement, by implication at least, that the money thus received should be expended in carrying forward the business for which the corporation was created. The subscription was also upon the terms and conditions contained in the charter. We may therefore say that the contract contained an agreement, that the defendant should have all the rights and privileges conferred upon him, as a stockholder, by the charter as it then was, and until those rights were changed or modified, by his consent, or by lawful authority. One of the conditions of the charter, and also of the general law of the state under which it was granted, was that it might be altered, amended, or repealed, at the pleasure of the General Assembly. That too was an element in the contract, by which the defendant agreed in advance to any reasonable alteration which the legislature might lawfully make. The power thus reserved is in terms absolute ; yet it is not an unlimited power. Like all other legislative powers it is subject to this important limitation, viz : it shall not be so exercised as to impair the obligation of a contract, or to destroy vested rights.

The acts of the corporation, in accepting the amendment to the charter, and in permitting the city to subscribe for the stock upon the terms contained in the amendment, deprived the defendants of the privilege of voting for two of the directors. The defendants say that the destruction of this right

absolved them from all obligation to pay for their stock. Whether it does or not is the question we are now to consider.

Some amendments, or laws, affecting corporations, are binding with or without their assent. Others bind the corporation and every member thereof, if assented to by a majority of the stockholders. And others are not binding upon non-consenting members, although assented to by the majority. All general laws, and mere matters of police regulation, are embraced in the first class. Additional powers, duties and privileges, which do not change essentially the nature and character of the corporation, or the purpose for which it was created, and have for their object the promotion of the enterprize originally contemplated, fall within the second class. All amendments which work a radical change in the nature and character of a corporation, or the purpose for which it was created, are within the third class.

It is not easy to establish a general rule by which it may be seen at a glance to which class any given case belongs. Each case must in a measure depend upon its own circumstances. A careful examination of the case before us, and the authorities bearing upon the question, has led us to the conclusion that it belongs to the second class, and that the amendment is binding upon every member of the corporation.

There is no change in the character of the corporation. It is a railroad company still, relating to an important public improvement. The object of its creation, the construction and operation of a railway from New Haven to Derby, remains precisely the same. There is some change in the mode of appointing the board of directors; but that change is not a radical one, nor is it, under the circumstances, an unreasonable one. So far from working an injury to the defendants, it is, as we have already seen, a benefit to them. The directors are elected by the stockholders, and every one has a voice in the election. No one has an undue advantage over the others, and the rights of all are carefully guarded. The object of the amendment was not to obstruct, hinder or change, but to facilitate, the enterprise in which all were engaged; and, so far as we can see, it has had the designed effect. It is not an

attempt on the part of the legislature to control the organization, or to place it in the power of one or more of the stockholders to elect all, or a majority, of the directors; but, on the contrary, the design was to prevent that result. The matter of voting and the mode of electing officers, are usually provided for in the charter. The legislature may, in the first instance certainly, impose such terms and restrictions as may be thought best. The powers reserved will authorize subsequent legislation upon the same subject, so long as the owners of the stock retain the control of the corporation, and are all placed upon equal and fair terms.

The rights therefore of which these defendants have been deprived, are rights which they held subject to such reasonable changes and regulations as the legislature might make, with the assent of the corporation; and they are not thereby absolved from their obligation to pay for their stock.

The decided cases on this subject will abundantly sustain our position. A few only of the many cases cited will be referred to. And first two or three of the strongest cases relied upon by the defendants.

*The Hartford & New Haven R. R. Co.* v. *Croswell,* 5 Hill, 383. That was an action against a subscriber to recover certain installments upon his stock. After the installments became due, the charter was altered, by authorizing the company, in addition to the powers originally granted, to purchase certain steamboats to be used in connection with its road, not exceeding in amount the sum of $200,000. It was held that neither the board of directors, nor a majority of the stockholders, could sanction the alteration so as to bind the defendant without his consent. In that case there was a diversion of the funds from the purpose originally contemplated. Here there is no such diversion. But even the authority of that case is considerably shaken by later cases cited below.

*The Troy & Rutland R. R. Co.* v. *Kerr,* 17 Barb., 581. The company was incorporated with a capital of $1,500,000. After the defendant subscribed to the stock, the articles of association were amended under a general law, by which the capital was reduced to $325,000, and the contemplated road

was materially shortened. The defendant refused payment of calls upon his stock, and, in an action brought to recover them, it was held that the plaintiffs were entitled to recover. There were other questions in the case. The presiding judge, who gave the opinion of the court, doubted upon this point, but seems to have acquiesced in the decision, partly upon the ground that there was evidence tending to show that the defendant assented to the change. But a majority of the court were of the opinion that there was no such radical change of the plan and business of the corporation, as exonerated the defendant. The presiding judge in the course of his opinion says, "Admitting that an alteration may discharge the obligation, was not this one incidental to the undertaking, and to which the stockholder must be considered impliedly to assent? and if not, was it so material as to be a ground of defence?" That case is in reality an authority against the defendants. The court seems to have gone further than we are required to go in the present case, as the alteration in that case was much more radical than in this.

*Sage* v. *Dillard*, 15 B. Monroe, 340. The corporation in that case was established purely for charitable purposes, and depended for its funds mainly upon voluntary contributions. The legislature from time to time authorized an increase in the number of corporators, and finally increased them arbitrarily, by appointing sixteen new corporators by name. The corporation refused to accept the amendment. The court held that the act of the legislature was inoperative. That case differs from this in two important particulars. First, in that case the amendment was rejected by the corporation; in this it was accepted. Secondly, that was an attempt by the legislature to have a voice in the management of funds contributed for charitable purposes, against the will of the persons to whom their management had been entrusted by the donors, and, presumptively perhaps, against the will of the donors themselves. They had vested in the old corporators the control of these funds. The action of the legislature was a manifest infringement of that right. Nothing of that kind appears in this case.

We have no occasion at this time to enter upon the discussion of the difference between an eleemosynary corporation, and a corporation for the prosecution of an enterprise involving public interests. It certainly seems reasonable that the power of the legislature to legislate in respect to the latter, should be more extensive than in respect to the former. The case of *Ffooks* v. *The London & South Western Railway Co.*, 19 Eng. Law & Eq., 7, maintains this proposition: The rule that the majority cannot bind the minority in a joint stock company, as to acts not contemplated by the common contract, has not been applied to corporate companies for a public undertaking, involving public interests and duties, under the sanction of parliament. Whether we should go so far, if the question was directly before us, we need not now say. We quote the case as showing that we are not going beyond the limits of the law elsewhere.

In the case of *The Buffalo & New York City R. R. Co.* v. *Dudley*, 14 N. Y., 336, it was expressly held that, "An alteration by the legislature of the company's charter, in pursuance of powers reserved, by changing its name, increasing its capital and extending its road, does not discharge the defendant from liability on his subscription; and this, whether such alteration is beneficial to the defendant or not, the alteration having been duly made, and without any fraud on the part of the company." See also *Schenectady & Saratoga Plank Road Co.* v. *Thatcher*, 11 N. Y., 102.

In this opinion the other judges concurred; except SEYMOUR, J., who, having been counsel in a case involving the same question, did not sit.