The People *ex rel.* George Hunt, Attorney General,

*v.*

The National Savings Bank.

*Filed at Ottawa October 4, 1889.*

1. Banks and banking—*limit in charter as to time of making subscription to capital stock—and the extent of such subscription required.* The charter of "The Kendall County Banking Company," the name of which was claimed to have been changed on June 1, 1872, to the "National Savings Bank," was granted by the legislature of this State on March 29, 1869. The tenth section of the charter provides: "This act shall be void, unless said corporation shall organize and proceed to business within two years after the passage of this act." The third section declares: "The capital stock of said corporation shall be $50,000, with power to increase the same to $150,000, and shall be divided into shares," etc. Only $10,000 of the $50,000 capital stock was subscribed and paid in within the two years limited by the charter: *Held,* that until all the capital stock was subscribed, the company had no authority to commence doing business, and that not having been done within the time prescribed, after the expiration of the two years the charter became void.

2. A clause in the eighth section of the charter provides that "before said corporation shall commence business, the stockholders shall pay the several amounts subscribed in full," etc. The words "several amounts subscribed," do not mean the several amounts subscribed which may aggregate less than the capital stock specified in the charter, but the several amounts subscribed which together make up the full amount of the capital stock. And as less than the $50,000 of capital stock, required by the charter, was paid in during the two years after its passage, the company was never legally in a position where it could "proceed to business" during that period, and consequently the charter become void under the tenth section.

3. SAME—*former decision.* The case of *Allman* v. *Havana, Rantoul and Eastern Railroad Co.* 88 Ill. 521, is not entirely overruled by the case of *Peoria and Pekin Union Ry. Co.* v. *Peoria and Farmington Ry. Co.* 105 Ill. 110. On the contrary, it is indorsed and quoted from in *Temple* v. *Lemon,* 112 Ill. 51. It stands as authority for the position, that, where the charter of a corporation says its capital stock "shall be" a certain, fixed sum, the corporation can not enter upon its regular business until the whole of such sum shall have been subscribed, unless the intention of the legislature to permit it to do so, is apparent from the language of the charter itself.

4. But although the capital of a corporation is fixed by its charter at a certain sum, and without that sum being subscribed it can not "proceed to business," yet the company may perform such acts as are necessary to perfect its organization, and to prepare it for entering upon its regular business, before the whole capital stock has been subscribed.

5. SAME—*whether a State bank may adopt the word "National" as a part of its name.* It is a matter of very serious doubt, under the restrictions in section 5243 of the National Banking act, whether a State bank doing business exclusively under the laws of a State can legally adopt the word "National" as a part of its corporate name.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

At the January Term 1886 of the Cook County Circuit Court, an Information in the nature of *quo warranto* was filed against the defendant in error, the National Savings Bank. Thereupon defendant filed its plea, setting up the following special act of the legislature:

"An act to incorporate the Kendall County Banking Company; in force March 29, 1869.

"SECTION 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That Warren M. Sweetland, John A. Coy, and all such persons as shall become stockholders in the corporation hereby created, and their successors, shall be a body politic and corporate, by the name and style of 'The Kendall County Banking Company,' and shall have a common seal, which they may alter or renew at pleasure; power to plead and be impleaded, defend and be defended, in all courts of law and equity; to have and exercise powers in-

cident to corporate bodies. Said corporation shall be located in the county of Kendall and State of Illinois.

"Sec. 2. A majority of the corporators herein named may proceed to open books for subscription to the stock of said corporation, and shall, at the same time or thereafter, designate a time and place for the first election of directors of said corporation by parties subscribing to the stock thereof, and each share of stock so subscribed for shall be entitled to one vote.

"Sec. 3. The capital stock of said corporation shall be $50,-000, with power to increase the same to $150,000, and shall be divided into shares of $100 each, which shares shall be deemed personal property, subject to taxation, and shall be transferable on the books of the corporation in accordance with the rules thereof.

"Sec. 4. The said corporation shall have power to borrow money, and to receive money on deposit and pay interest thereon; and to loan money, either within or without this State, at any rate of interest, not exceeding that now or hereafter allowed by law, to private individuals; and to discount loans,—and in computation of time thirty days shall be deemed a month, and twelve months a year,—and to make such loans payable either within or without this State, and to take such securities therefor, real, personal, or both, as the directors or managers of said corporation shall deem sufficient, and may secure the payment of such loans by deeds of trust, mortgages or other securities, either within or without this State; may buy and sell negotiable paper and other securities; may pur-.chase and sell real estate, and shall have the power to convey the same in any mode prescribed by the by-laws of said corporation; may accept and execute all such trusts, whether fiduciary or otherwise, as shall or may be committed to it by any person or persons, or by the order or direction of any court or tribunal, or other legally constituted authority of the State of Illinois, or of the United States, or elsewhere; may

make such special regulations in reference to trust funds or deposits left for accumulation or safe keeping as shall be agreed upon with depositors or parties interested, for the pur-' pose of accumulating or increasing the same ; may issue letters of credit and other commercial obligations,—not, however, to circulate as money,—and may secure the payment of any loans made to said corporation in any way the directors of said corporation may prescribe.

"Sec. 5. Married women and minors may, in their own names, subscribe for stock and deposit money with said corporation, and receive certificates of stock and deposits in their own names, which stocks and deposits shall be subject to their disposal and order only.

"Sec. 6. The said corporation shall have power to purchase and hold such real estate as may be necessary for the transaction of a *bona fide* banking business, and to take and hold any real estate as security for and in payment of loans and debts due or to become due to the corporation; and to purchase real and personal estate at any sale to enforce its securities or the payment of debts due, made by virtue of any process, mortgage or deed of trust, and to hold, use, improve, lease or sell and convey the same.    Said corporation may make, alter and amend such by-laws, rules and regulations as are not inconsistent with the laws of this State or the United States : *Provided,* that any real estate sold under deed of trust or other conveyance held as security by said corporation, may be redeemed by the debtor, his, her or their heirs or creditors, by the payment of the full amount of debt and costs, with ten per cent interest on same, at any time within twelve months after such sale : *And provided, also,* that no real estate which may become the property of said corporation, except such as may be reasonably necessary in the transaction of a *bona fide* banking business, shall be held by said corporation for a longer period than may be reasonably necessary to enable said corporation to sell and dispose of the same to advantage.

"Sec. 7. The business of said corporation shall be conducted by a board of not less than five directors, to be elected annually by the stockholders, who shall hold their offices until their successors are elected and qualified. The directors shall be stockholders, and residents of the said county. Each share of stock shall be entitled to one vote, and may be cast in person or by proxy. The board of directors shall elect a president and cashier, and such other officers and agents may be appointed or employed as said corporation or its officers may see proper.

"Sec. 8. Before said corporation shall commence business the stockholders shall pay the several amounts subscribed in full, and no increase of said capital stock shall be made at any time unless the amount thereof shall be paid into said corporation at the time of the issue of such stock, and the whole capital stock, including such increase, shall not exceed in amount the actual value of the property of said corporation at the time of the issue of such increased stock.

"Sec. 9. Whenever default shall be made in the payment of any debt or liability contracted by said corporation, the stockholders shall be held individually responsible for an amount equal to the amount of stock held by them, respectively, and such liability shall continue until three months after an assignment of the stock, and publication of a notice thereof in a newspaper published at the said . . . . . of . . . . . . . ., in the county of Kendall and State of Illinois.

"Sec. 10. This act shall be void unless said corporation shall organize and proceed to business within two years after the passage of this act.

"Sec. 11. No director of said corporation shall be indebted to said corporation, either directly or indirectly, at any time, to any amount greater than seventy-five per centum of the amount of the capital stock held by such director, in his own name, in good faith, as his own.

"Sec. 12. This act shall be deemed a public act, and shall be in force from and after its passage."

The plea further states that the said charter was immediately accepted, books for subscription were opened, and stock to the amount of $10,000 was subscribed for and paid up in full; that on August 2, 1870, said stockholders met at Millington, in Kendall county, and elected five directors, to serve one year, and until their successors were elected and qualified. The same day the directors elected a president, cashier and secretary *pro tem,* and ordered the cashier to procure a place of business, and pay the expenses incurred for books, furniture and other fixtures, and they adopted a corporate seal. A place of business was secured in Millington, books opened, and a general banking business transacted until June 1, 1872. On June 1, 1872, pursuant to notice, the stockholders changed the name to "National Savings Bank," changed the location to Chicago, increased the number of directors to nine, and increased the capital stock to $200,000. Meetings were held in Chicago July 1, 1873, July 2, 1873, August 5, 1873, and July 2, 1874, and no stockholders' or directors' meetings were held after that time, no officers or directors elected, and no actual business done, until November 30, 1885, but that at short intervals during all said time the stockholders solicited further subscriptions to the capital stock, offered their stock for sale, and frequently and persistently endeavored to induce said corporation to resume business. On November 24, 1885, subscriptions to the amount of $190,000 were obtained, and on November 30, 1885, a meeting of stockholders was held in Chicago, and nine directors were elected, who proceeded to organize by the election of officers, and ordered them to proceed to the transaction of business, under the charter, which the officers then proceeded to do. On December 3, 1885, the full amount of $190,000 last subscribed was paid in, making full payment of the total capital of $200,000. Said corporation thereupon entered upon and engaged in a general bank-

ing business (not including the issuing of bills to circulate as money) in the city of Chicago and State of Illinois.

The People, by the Attorney General, demurred to said plea, which demurrer was by the court overruled. The Attorney General elected to stand by the demurrer, and the court thereupon entered judgment for the defendant. Overruling said demurrer is assigned as error, and the case is brought here for the consideration of this court as to the sufficiency of said plea to justify the defendant in the exercise of its supposed powers and franchises.

Mr. GEORGE HUNT, Attorney General, for the plaintiffs in error.

Mr. GEORGE C. CHRISTIAN, and Mr. D. M. HILLIS, for the defendant in error.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

An Act to incorporate "The Kendall County Banking Company," whose name is claimed to have been changed, on June 1, 1872, to The "National Savings Bank," was passed by the Legislature of this State on March 29, 1869. Its 10th section is as follows: "This act shall be void, unless said corporation shall organize and proceed to business within two years after the passage of this Act."

The 3d section of the act provides as follows: "The capital stock of said corporation shall be $50,000.00, with power to increase the same to $150,000.00, and shall be divided into shares of $100.00 each," etc. On August 1, 1870, one person subscribed for 95 shares, and five persons, each for one share, making a total subscription of $10,000.00, which was paid in, on that day, in money. It is admitted, that no more of the capital stock was subscribed for or paid in, until November 24, 1885.

The terms of the charter are as positive, as they are explicit, that the capital stock "*shall be*" $50,000.00. Until all the

capital stock was subscribed, the company had no authority to commence doing business. Having failed to get more than one fifth of the required subscriptions during the two years, it was, of course, unable to "proceed to business" within that period, in accordance with the 10th section of the charter. It follows, that, after March 29, 1871, the act in question became void.

That the law is as here stated will appear by a reference to the authorities. Redfield on Railways (Vol. 1, 4th ed. page 65) says: "Where business corporations are created with a definite capital, it is regarded as equivalent to an express condition, that the whole stock shall be subscribed before the company can go into full operation." (referring to *Shutz* v. *The S. & T. Railw. Co.* 9 Mich. 269; *The People* v̇. *The Troy House Co.* 44 Barb. 625, and other cases.)

Boone on corporations says: "Where the capital stock and the number of shares are fixed, a corporation cannot commence the business, to carry on which it is created, before the whole stock is subscribed, unless by legislative enactment." (referring to *S. M. & M. R. R. Co.* v. *Anderson*, 51 Miss. 829; *Livescy* v. *Omaha Hotel*, 5 Neb. 50; *Hughes* v. *Antietam Man. Co.* 34 Md. 316; *Troy & Greenfield R. R. Co.* v. *Newton*, 8 Gray, 596; *Penobscott R. R. Co.* v. *White*, 41 Me. 512; *Oldtown Lincoln R. R. Co.* v. *Veazie*, 39 id. 571; *Fox* v. *A. C. S. & V. Turnpike Co.* 46 Ind. 31; *Willamette Freighting Co.* v. *Stannus*, 4 Ore. 261, and other cases).

In Morawetz on Private Corporations (secs. 137, 408, 781) it is said: "If the capital of a corporation is fixed by its charter at a certain amount, the company has no authority by law to begin the prosecution of its enterprise, until the whole amount of capital has been subscribed. *  *  * In the absence of some provision, indicating a contrary intention, the subscription of the entire capital, fixed by the charter, is always a condition precedent to the right of the company to begin the prosecution of its main enterprise. *  *  * Until

40—129 ILL.

the amount of capital, fixed by the charter, has been subscribed, the right of the company to begin to carry on business remains inchoate," * * * (referring to *Bray* v. *Farwell*, 81 N. Y. 607; *Allman* v. *Havana, etc. R. R. Co.* 88 Ill. 521; *Peoria, etc. R. R. Co.* v. *Preston*, 35 Iowa, 118; *Barry* v. *Merchants Exchange Co.* 1 Sandf. Ch. 280; *Hightower* v. *Thornton*, 8 Ga. 499, etc.)

The rule, here announced, is justified alike by the claims of honesty and by the demands of public policy. Those, who deal with a corporation, look to its charter, in order to ascertain the extent of the means contributed to it, and in order to judge of its ability to meet its engagements and perform its undertakings. They are deceived and lulled into a false security, when the company is permitted to do business on a less capital than that fixed in the Act of incorporation.

Counsel for defendant in error refer to certain cases, which, we think, are either distinguishable from the case at bar, or sustain the views of the text writers above quoted. In *Minor* v. *Mechanics' Bank*, 1 Pet. 44, the language of the charter was: "the capital stock * * * *may* consist of $500,000.00," etc.; the Court construed "may" in its ordinary sense, and held that it was not clear, that the legislature intended to require the capital to be $500,000.00. In *Lessee of Frost* v. *Frostberg Coal Co.* 24 How. 278, and *McCartney* v. *C. & E. R. R. Co.* 112 Ill. 611, the capital stock was all subscribed, before operations were begun. In *New Haven & Derby R. R. Co.* v. *Chapman*, 38 Conn. 56, where the capital was $500,000.00, and the directors began the construction of the railway, when $416,700.00 had been subscribed, leaving $83,300.00 unsubscribed, the charter expressly permitted the construction of the road to be commenced, whenever $100,000.00 of the capital stock should have been subscribed. In *Perkins* v. *Sanders*, 56 Miss. 733, although the resolution, conferring authority to make the contract, sued on, may have been passed before all the stock was subscribed, yet the contract was not executed

until thereafter. In *Allman* v. *Havana, Rantoul & Eastern R. R. Co.* 88 Ill. 521, this Court said: "The capital stock was fixed, definitely, at $1,000,000.00, to be divided into 10,000 shares, of $100.00 each, and that amount must have been subscribed before the corporation could have a legal existence. It was a condition precedent to the legal existence of the company. There is nothing in the "articles" or in the statute, which authorizes the corporation to commence operations, when a less amount is subscribed. Very many charters might be cited, which declare, where a less amount than the whole capital stock is subscribed, the corporation may proceed in their business; but nothing of that sort is found in this case."

To say, that all the capital stock must be subscribed, before the corporation can have a *"legal existence,"* is not the same as saying, that such stock must all be subscribed, before the corporation can enter upon the transaction of its regular business. In this respect, the language of the *Allman* case, although appropriate, when used in reference to the charter of a company, organized under the general railroad law, such as was there under consideration, may be too broad, when applied to the charter of the defendant in error, the first section of which provides, "that Warren M. Sweetland, John A. Coy and all such persons, as shall become stockholders in the corporation *hereby created,* and their successors, shall be a body politic," etc. Although the capital of a corporation is fixed by its charter at a certain sum, the company has a right to perform such acts, as are necessary to perfect its organization, and to prepare it for entering upon its regular business, before the whole capital has been subscribed. (Morawetz on Private Corp. secs. 408 and 409.)

But counsel are mistaken in supposing, that the *Allman* case is entirely overruled by the case of *P. & P. U. Ry. Co.* v. *P. & F. Ry. Co.* 105 Ill. 110. On the contrary, it is endorsed and quoted from in *Temple* v. *Lemon,* 112 Ill. 51. It stands as authority for the position, that, where the charter of a corpo-

ration says its capital stock "*shall be*" a certain, fixed sum, the corporation cannot enter upon its regular business, until the whole of such sum has been subscribed, unless the intention of the Legislature to permit it to do so, is apparent from the language of the charter itself.   No such intention appears in the act, incorporating "The Kendall County Banking Company."

By the terms of that act, all the capital stock was actually required to be paid in, before business could be commenced.

The eighth section is as follows :

"Before said corporation shall commence business, the stockholders shall pay the several amounts subscribed in full ; and no increase of said capital stock shall be made at any time, unless the amount thereof shall be paid into said corporation at the time of the issue of such stock ; and the whole capital stock, including such increase, shall not exceed, in amount, the actual value of the property of said corporation at the time of the issue of such increased stock."

The words, "the several amounts subscribed," do not mean the several amounts subscribed, which may aggregate less than the capital stock, but the several amounts subscribed, which together make up the full amount of the capital stock. This will be apparent from the phraseology of the sections, which precede the 8th section.   It is also apparent from the language of the second clause of the 8th section, beginning : "and no *increase* of said capital stock shall be made," etc. The words, "said capital stock" refer back to the words, "the several amounts subscribed."   "Said capital stock" in the second clause, is the same thing as "the several amounts subscribed," in the first clause.   The two expressions are used interchangeably.

If the amount of every increase of the capital stock must be paid in, the same reasoning and the same policy would require the original capital stock itself to be paid in.   The natural construction of the first and second clauses of the 8th

section is this: before the corporation shall commence business, the amounts subscribed to make up the capital stock shall be paid in full, and any *increase* over the amounts so subscribed shall, also, be paid in full at the time of issuing the stock therefor.

If we are correct in this view, then as only $10,000.00 of the $50,000.00 of capital stock, required by the act, was paid in during the two years after its passage, the company was never legally in a position, where it could "proceed to business" during that period, and consequently the act became void under the 10th section thereof.

We cannot refrain from saying, that the new name, selected by the Company—"National Savings Bank,"—is, in our opinion, an unfortunate one. It is generally understood, that savings' banks are patronized chiefly by the poorer and laboring classes of the community. The use of the word, "National," might convey to their minds the impression, that the bank was organized under the Act of Congress in relation to National Banks. Indeed, it is a serious question, whether, under the terms of the latter act, the name can be legally made use of at all. Section 5243 of the National Banking Act is as follows: "All banks, not organized and transacting business under the national currency laws, or under this Title, and all persons or corporations, doing the business of bankers, brokers or savings institutions, except savings-banks, authorized by Congress to use the word "National," as a part of their corporate name, are prohibited from using the word "national," as a portion of the name or title of such bank, corporation, firm or partnership," etc.

For the reasons, herein stated, the judgment of the Circuit Court is reversed.

*Judgment reversed.*