## HYATT, receiver, &c. vs. ESMOND.

The fact that an assessment, made upon a premium note, includes ten per cent for *expenses*, besides losses, does not render the assessment irregular and void.

One who has contracted with an insurance company as an existing corporation, and has executed a promissory note to it, and received a policy of insurance from it, of which he has enjoyed the benefit and protection, is not in a condition to object to the regularity and validity of the organization of the company.

Where an insurance company, whether in strictness of law legally constituted or not, was ushered into existence under the act of 1849, and certificates from the proper officers, authorizing it to commence doing business, were delivered, furnishing, if regular, a *prima facie* authority for its action; and there was a professed compliance by the corporation with the law of its organization, and a user and exercise of corporate powers for several years, undisturbed by the sovereign power or any private citizen; *Held* that these were sufficient marks and manifestations of a corporation *de facto* to entitle it to be treated as a legal body, and that they were practically conclusive upon one who had dealt with it as a valid corporation by taking a policy of insurance from it, and giving his note for the premium.

If an insurance company uses premium notes previously given, as the basis for an extension of its charter under the act of 1849, without the consent of the makers, this cannot be considered a *diversion* of the notes from the purpose for which they were given, until they are put to some use, *prejudicially to the makers,* different from the use for which they were intended.

Although such notes be counted in, to make the necessary amount of capital indispensable to the creation or continuance of the company, under its extended charter, *it seems* this will not operate to the prejudice of the makers.

Yet if such notes are attempted to be enforced without the occurrence of losses, or an assessment for them; or if the assessment is shown to be for losses of a character to which the notes are not liable to contribute, such facts will constitute a total or a partial defense, *it seems.*

Conceding that premium notes held by an insurance company previous to the act of 1849, are not such capital premiums or engagements as are required by sections 5 and 11 of that act, and therefore that a company renewed or extended by virtue of that act has not the proper or necessary capital indispensable to its authority to do business under the amended charter, yet it is nevertheless a corporation *de facto*, having a nominal if not a rightful existence, under its old charter, and in the actual exercise of corporate powers. And one who has contracted with and treated it as a valid corporation, cannot raise the objection that it has not the necessary capital.

It is not a valid objection to an extended charter authorized by the act of 1849, that it makes a substantial change in the corporate powers. The

right to alter, amend or repeal being reserved in the acts of 1836 and 1849, the exercise of that power by the legislature cannot be objected to. It becomes a provision of the contract, and a condition upon which the acceptance of the benefits of the law or the charter is based.

Notwithstanding the termination of the period for which an insurance is made, a qualified membership still continues. The premium note is liable to assessment for losses, and if the assessment is not paid, within the time prescribed by law, the maker is liable for the whole amount of the premium note.

APPEAL by the defendant from a judgment in favor of the plaintiff, rendered at the Rensselaer circuit, for $129.50 and costs, on a trial had before Justice GOULD, in October, 1861. The facts are sufficiently stated in the following opinion.

*W. A. Beach* and *C. F. Tabor,* for the plaintiff.

*C. J. Lansing* and *E. F. Bullard,* for the defendant.

*By the Court,* HOGEBOOM, J. This action is brought to recover $129 claimed to be the balance remaining due on a premium note for $200, on account of a default in paying an assessment for losses thereon to the amount of $1.40. The note was actually made by the defendant in March, 1852, but was in fact given in substitution of another note for $200, made by other parties (Cole & Searing) in March, 1848, when they were insured to the amount of $1000 in the Rensselaer County Mutual Insurance Company, of which the plaintiff is receiver, on certain real estate in Saratoga county. The defendant having subsequently become the owner of this property substituted his note for that of the original parties. The transaction must therefore be considered as having taken place at the first named period, and the rights of the parties be governed by the state of things existing at that time, so far as the validity of the note is concerned. The plaintiff was appointed receiver of this company in the usual manner, on the 19th of February,

1855. One of the questions made in the case is, as to the validity of his appointment, or rather, as to his title to the note in question, it being claimed by the defendant that one George B. Allen derived title thereto, and was the owner thereof, by virtue of an assignment made by the insurance company to him on or about the 29th day of January, 1855. On the last mentioned day the company, by resolution, declared their inability to pay their debts, punctually, and the expediency of making a general assignment of their property for the benefit of their creditors, to said Allen. Accordingly, on that day, a written assignment under the seal of the company was in form executed to him, and he, being examined as a witness, stated that he accepted the assignment and never gave any *written* waiver of it. But it does not appear that he took any steps under it, farther than to ask the clerk in the office if he would assist him, and that on the 5th of February, 1855, an order of reference was granted for the appointment of Allen as receiver of said company, directly following which in the case was given in evidence a stipulation of the company that Hyatt be appointed "in place of George B. Allen, who declines serving." Another order was accordingly obtained, on the 19th of February, 1855, appointing the plaintiff such receiver, and he gave bond, and his appointment was completed in the usual form, and he has ever since acted as receiver of this company. This is substantially the evidence on this point, and on this state of facts the court was requested to nonsuit the plaintiff, on the ground, among others, that by the assignment to Allen and his acceptance of it, he became entitled to the note in question, and should have been plaintiff in the suit. This was refused, and the defendant excepted. The court was then requested to charge the jury in conformity with the last mentioned ground of nonsuit. The court refused, and the defendant excepted. There does not appear to have been any specific request to go to the jury upon this question. If there had been, I should have had some doubt whether, on

this evidence, it would not have been the duty of the court to submit that question to the jury. There was evidence favoring the theory of a transfer of the assets to Allen, and it is by no means clear on this evidence that he had not the title. I have felt the difficulty on this point in one or more other cases brought by the same plaintiff, tried before me. And although I felt authorized on the whole to conclude that the plaintiff had title, it was, I think, upon evidence stronger in his favor than appears in the present case. The question is not without embarrassment, on the actual facts of the case; but as there was evidence in this case tending materially to support the plaintiff's title, I think the judge was warranted in refusing the nonsuit. And as there was no request to submit this question to the jury, there was no legal error on this part of the case of which the defendant can avail himself.

The plaintiff having perfected his appointment as receiver, proceeded subsequently to pray this court for authority to make assessments for losses and incidental expenses. He received such authority, in a specific order of this court, made on the 10th of November, 1855, and made the assessment in accordance therewith. The validity of this assessment is questioned in several grounds taken on the motion for a nonsuit, some of which I will consider.

(1.) It is objected that the assessment is made to cover losses mainly had upon the cash policies. I perceive no sufficient evidence of this fact. (2.) That the assessment does not include all the notes held by the company at the several times when the losses in question occurred. Some evidence appears in the case touching this point, but I do not see enough to impair the validity of the assessment, or to justify a jury in finding in favor of this proposition of the defendant. The request to nonsuit or to submit to the jury on this proposition was, I think, properly refused. (3.) That the assessment does not fix the sum to be paid by each member in proportion to the original amount of his deposit note.

I do not discover any sufficient evidence on which to base this proposition. (4.) That the assessment is irregular and void because it includes ten per cent for *expenses*, besides losses. I think this course was justified by the *law*, by the *decision* of this court, and by the *by-laws* of this company. (*See Laws of* 1853, §§ 13, 6, 20, *of ch.* 466. *Hyatt, receiver,* v. *McMahon, opinion of Wright, J., MS. By-Laws of Company,* § 28.)

There are other objections made to the validity of the assessment, but they are also presented as distinct grounds for a nonsuit, and perhaps deserve separate consideration. It is said that the company had no right to use the premium note in question, and others of a like character, as the basis for an extension of the charter; and that it amounted to a diversion of the notes without the defendant's consent. Assuming that the defendant's note was one of those employed for the purpose of supplying the necessary amount of capital to justify an extension of the charter, the proposition still remains that so far as this objection is aimed at the irregularity and invalidity of the organization of the company under the extended charter, it seems to be an objection which the defendant is not in a condition to take. He has contracted with this company as an existing corporation; he has executed a note to it, and received a policy of insurance from it, the benefit and protection of which he must be presumed to have to a greater or less extent enjoyed. The company itself, whether in strictness of law legally constituted or not, was ushered into existence under the act of 1849, under the auspices of the attorney general and comptroller; at least their certificates, or those of commissioners appointed by them—essential prerequisites to the commencement of 'business by the company—were delivered to the company and furnished, if regular, a prima facie authority for their action; there was a professed compliance by the company with the law of their organization; and added to this was a user and exercise of corporate powers for several years undisturbed

by the sovereign power or any private citizen. These are sufficient marks and manifestations of a corporation de facto to justify it to be treated as a legal body, and, as it appears to me, are practically conclusive upon the defendant. (*Eaton* v. *Aspinwall*, 19 *N. Y. Rep.* 119. *Methodist Episcopal Union Ch.* v. *Pickett, Id.* 482. *Bank of Toledo* v. *International Bank*, 21 *id.* 542. *Brouwer* v. *Appleby*, 1 *Sandf.* 158. *Trustees of Vernon Society* v. *Hills*, 6 *Cowen*, 23. *U. S. Bank* v. *Stearns*, 15 *Wend.* 314.)

Nor can it be said, perhaps, to be an effectual *diversion* of the defendant's note from the purpose for which it was given, until it is put to some use, *prejudicially to the maker*, different from the use for which it was intended. Now, assuming that it was counted in, to make the necessary amount of capital indispensable to the creation or continuance of this company under its extended charter, (*Laws of* 1849, *ch.* 308,) it is not quite apparent how this operated to the *prejudice* of the defendant. If indeed the note was attempted to be enforced without the occurrence of losses or an assessment for them, or if the assessment was shown to be for losses of a character to which the defendant's note was not liable to contribute, such facts might constitute, perhaps, a total or a partial defense. But these facts, so far as I see, do not appear. At all events, they were not presented to the trial court in such a direct or specific manner as required the judge to rule in favor of the defendant, on that ground, as a question of law. But I think the fact is otherwise from what I have *assumed* it to be in arguing this objection, and the defendant's note was not one of those used as the basis for extending the charter. It was in fact given *after* the new company was organized, or the old company extended. And it does not even distinctly appear that the original note out of which it sprung was employed for that purpose.

The objection which I have already considered disposes of another distinctly made, but in effect involved in the pre-

vious observations, to wit, that the premium notes held by the old corporation were not such capital premiums or engagements as were required by sections 5 and 11 of chapter 308 of the laws of 1849, and therefore that the new or extended company had not the proper or necessary capital indispensable to their authority to do business under the amended charter. Conceding this to be so, it was nevertheless a corporation *de facto*, having a nominal if not a rightful existence, and perhaps a rightful existence under the old charter, whose duration in point of time had not then ended, in the actual exercise of corporate powers, the propriety of which the defendant has recognized by contracting and treating with it as a valid incorporation. The authorities to this point have been already cited. See, in addition, 22 *How. Pr. Rep.* 45; 17 *Barb.* 378.

It is further objected that the extended charter authorized by the act of 1849, makes a substantial change of the corporate powers. 1. By allowing to the holder of a cash policy a number of votes, as compared with the holders of policies in the old company, greatly disproportioned to the inconsiderable amount of cash premium actually paid. 2. By authorizing the directors, without the consent of the members, to take cash premiums for a small amount and issue large risks thereon to the prejudice of the defendant and others similarly situated. 3. By authorizing the taking of marine risks, intended probably to refer to the taking of risks of inland navigation and transportation. As the right to alter, amend or repeal was reserved in the acts of 1836 and of 1849, it is not possible successfully to object to the exercise of this power by the legislature. It becomes a provision of the contract, and a condition upon which the acceptance of the benefits of the law or the charter is based. I concur in the views expressed on that subject by Justice PECKHAM in the case of *Hyatt, receiver,* v. *Whipple and Holmes,(a)* supported as they are by the cases to which he refers. *(Sche-*

(a) Ante, p. 595.

nectady and Saratoga Plank Road Co. v. Thatcher, 1 Kern.
102. Northern R. R. Co. v. Miller, 10 Barb..260. White
v. Syracuse and Utica R. R. Co., 14 id. 559. Troy and
Rutland R. R. Co. v. Kerr, 17 id. 581.)

It is a different and a more embarrassing question how far
alterations radical in their nature as to the character of the
business to be carried on, and the mode of conducting the
same, can be made to affect notes or securities previously
taken, and executed to accomplish a different purpose ; and
how far alterations will be deemed to be so radical as to work
a departure from the fundamental and original objects of the
incorporation. I do not find it essential, in the present case,
to determine that question. So far as respects the right to
transact business, and to issue policies upon the payment of
a fixed cash premium, the question has been decided in the
affirmative, and for this court conclusively settled, at least
for the present, by the case of Mygatt v. New York Protec-
tion Ins. Co., (21 N. Y. Rep. 52.) So far as respects the
right to issue policies on risks of inland navigation and trans-
portation, it does not appear that any of the losses for which
assessments were made, embraced risks of that character.
Indeed, it affirmatively appears that no risks of that descrip-
tion were assumed by the company. In this respect, there-
fore, there seems to be nothing which has had the effect of
increasing the risks or liability of the defendant on the note
prosecuted.

I discover nothing available in the defense of the statute
of limitations. Indeed, though made a point on the trial,
it does not seem to have been set up in the answer, and per-
haps was overruled on that ground. The note could not be
enforced until losses had occurred and assessments were made,
and these were within six years prior to the commencement
of the action.

Finally, it is urged that the court erred in allowing the
plaintiff to recover more than the assessment of $1.40. It
is not denied but that the members are liable for the whole

Hyatt *v.* Esmond.

amount of the premium note if they fail for thirty days to pay the assessment. (*Charter,* § 11; *Jefferson county Act, to which this company is made subject, Laws of* 1836, *ch.* 41, § 10.) But it is claimed that inasmuch as the policy was dated on the 3d of March, 1848, and was to continue only for five years, and inasmuch as by section 12 of the charter, as well as by section 2 of the act of 1836, (chapter 41,) it was provided that the persons who were insured should be and continue members of said company, so long as they were insured therein and no longer. Therefore the defendant was not a member, and if not a member, then incapable of being held upon his deposit note. But I think this is too limited an interpretation of the fact and effect of membership. An alienation of the subject of insurance avoided the policy, by the terms of the act and of the charter, (*Laws of* 1836, *ch.* 41, § 7; *Charter,* § 9;) and would seem necessarily thereby to destroy the membership. Nevertheless both provide in the same sections, just quoted, that the assured shall be entitled to receive his deposit note upon the payment of his proportion of all losses and expenses that have accrued prior to the surrender of the policy, to be made upon an alienation of the property. Notwithstanding therefore the termination of the period for which the insurance is made, a qualified membership still continues. I had occasion to consider this subject in a case recently decided by the general term of this district, and to support this view of the case by a reference to former adjudicated cases. (*Hyatt, receiver,* v. *Wait and Simmons, ante,* p. 29. *Neely* v. *Onondaga Mutual Ins. Co.,* 7 *Hill,* 49. *Huntley* v. *Beecher,* 30 *Barb.* 580.)

The result of my examination of this case is that the judgment of the circuit court should be *affirmed.*

[ALBANY GENERAL TERM, May 5, 1862. *Hogeboom, Peckham* and *Miller,* Justices.]