·(41 App. Div. 43.)

## ROCHESTER & C. TURNPIKE-ROAD CO. v. JOEL.

(Supreme Court, Appellate Division, Fourth Department. May 24, 1899.)

.1. EVIDENCE—JUDICIAL NOTICE.
　　The court may take the judicial notice of the fact that bicycles are extensively used as a means of conveyance.

.2. CONSTITUTIONAL LAW—TURNPIKES AND TOLL ROADS—DUE PROCESS OF LAW.
　　Where a turnpike company, which organized and constructed its road under Laws 1847, c. 210, and Laws 1882, c. 92, giving it a right to charge toll for animals and vehicles, including bicycles, has a limited period of existence, an amendatory act, prohibiting the charging of toll for bicycles, which reduces the company's earnings 25 per cent., deprives it of its property without due process of law, although the act of 1847 provided that the legislature might at any time amend or repeal the act, or annul any corporation formed thereunder, and Const. 1846, art. 8, § 1, authorizing the formation of corporations under general laws, provides that "all general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

.3. SAME—OBLIGATION OF CONTRACT.
　　Such act is also unconstitutional as impairing the obligation of a contract. Hardin, P. J., dissenting.

Appeal from trial term, Monroe county.

Action by the Rochester & Charlotte Turnpike-Road Company against Phineas C. Joel. Judgment for defendant, and plaintiff appeals. Reversed.

The plaintiff was incorporated in March, 1880, pursuant to chapter 210 of the Laws of 1847, known as the "General Turnpike Law." Its road is nearly five miles in length, and extends from the city of Rochester to the village of Charlotte, on the shore of Lake Ontario. The capital stock of the company was fixed at $20,000, but, as some difficulty was encountered in the attempt to obtain subscriptions for that amount, an application was made to the legislature for relief, which resulted in the enactment of a law which granted to the plaintiff the right to charge certain fixed sums for the use of its road, which sums were not measured by the length of the road, as in the general turnpike law, but varied according to the character of the vehicle or animal passing the toll gate. Laws 1882, c. 92. Included in the schedule of rates thus established were the following, viz.:

| | |
|---|---|
| For each pleasure carriage drawn by one animal, | $.05 |
| For each pleasure carriage drawn by two animals, | .10 |
| For each velocipede or bicycle, | .05 |

In anticipation of the passage of this special act, the plaintiff's managers ·succeeded in obtaining subscriptions for the remainder of its capital stock, and the road was completed and put into operation on the 18th day of April, 1882. The total cost of the road when thus completed was about $30,000, and the amount thereof in excess of the capital stock was obtained by the issue of the company's bonds, secured by mortgages upon its property. In 1888 the plaintiff constructed a side path for the convenience of persons using bicycles, at · a cost of between $1,200 and $1,500, and from 1882 to 1897 it charged and exacted from wheelmen a toll of 5 cents for the round trip; but in the last-named year the rate was, by special arrangement with the association known as the "League of American Wheelmen," reduced to 3 cents. In 1898 the legislature of this state amended the act of 1882 by striking therefrom the provision permitting the plaintiff to charge a toll for each velocipede or bicycle, and re-enacting it as to the rates originally fixed for other vehicles. The plaintiff, claiming that this last-mentioned act was invalid, continued for a short time to exact toll from wheelmen using its road or side path; and this action is brought to recover the penalty provided by section 132 of the trans-

portation corporations law, which it is alleged the defendant has incurred by reason of his passing the plaintiff's tollgate while riding a bicycle without paying toll therefor.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, and SPRING, JJ.

David Hays, for appellant.

John Desmond, for respondent. .

. ADAMS, J. The defendant, in his answer, admits that he passed the plaintiff's tollgate at the times and in the manner alleged in the complaint, and that he did so with the intent to avoid the payment of toll, but he claims that he was justified in so doing by reason of the provisions of the act of 1898. In opposition to this claim, the plaintiff contends that, inasmuch as the necessary effect of the act of 1898 was to destroy vested property rights, it was in direct contravention of that principle embodied in the fundamental law of both the state and nation which declares that no person shall be deprived of property without due process of law (Const. art. 1, § 6; Const. U. S. art. 14, § 1), and also of that related provision of the federal constitution which inhibits a state from passing any law impairing the obligation of contracts (Const. U. S. art. 1, § 10). It is apparent, therefore, that the case involves, under somewhat peculiar conditions, a consideration of that vexata quæstio, the extent and limitation of legislative power; and it is equally obvious, in view of its far-reaching consequences, that a satisfactory determination of that question, upon the facts here presented, can only be reached by a somewhat critical and extended investigation of precedents. As introductory to such investigation, it will be well, perhaps, to advert to certain features of the case as to which there is, and can be, no controversy. The plaintiff, when it perfected its organization under the provisions of the general turnpike law, and complied with the requirements of that law, acquired a valuable franchise, in virtue of which it was not only enabled to construct its road, but also to derive such profit and advantage therefrom as might be gained from the patronage of the traveling public. That a franchise thus acquired, whether it be conferred by the original charter, or by subsequent grant of additional rights and privileges, is "property," of which, generally speaking, the owner cannot be deprived by later legislation, unless under the exercise of the power of eminent domain, is a principle well established. Story, Const. § 1394; Railroad Co. v. Kennedy, 15 App. Div. 588, 44 N. Y. Supp. 825; Railroad Co. v. Kerr, 72 N. Y. 330. And it is equally clear that a corporation is a "person," within the meaning of the provision of the constitution which declares that no person shall be deprived of his property without due process of law. Railroad Co. v. Beckwith, 129 U. S. 26, 9 Sup. Ct. 207. But just here it will be proper to observe that the act of 1847 under which the plaintiff was incorporated contains this provision, viz.: "The legislature may at any time alter, amend or repeal this act, or may annul or repeal any corporation formed or created under this act." Section 51. And it is because of the right thus reserved that the defendant insists that the enactment of 1898, the

effect of which was to deprive the plaintiff of the privilege any longer to insist upon the payment of toll as a condition of the use of its road by wheelmen, was a proper and legitimate exercise of legislative power. It would seem, therefore, that the questions to be considered upon this review may be narrowed down to these two propositions: First, Did the act of 1898 deprive the plaintiff of any property rights? And, second, if such was its effect, was it a valid exercise of the reserved power which resided in the legislature, within the contemplation of the provision of the act of 1847 to which reference has just been made?

The learned judge before whom this action was tried found, among other facts, that the act of 1898 apparently did not impair the plaintiff's income, to the extent of preventing it from paying its operating expenses, fixed charges, and a fair annual dividend to its stockholders; and if the evidence in the case will permit the inference that the diminution of the plaintiff's receipts subsequent to the passage of that act was in part, at least, attributable to other causes, such a finding is not entirely without support. But it is a curious fact that, notwithstanding the existence of one or two competing lines of transportation, the plaintiff's receipts had averaged about the same each month until deprived of the right to exact toll from wheelmen, when they suddenly dropped off to the extent of nearly or quite $200 per month. There are some things of which the courts must take judicial notice, and no fact is brought more forcibly or more frequently to our attention than the extent to which bicycles are now employed as a means of conveyance. They have, to a large extent, superseded the ordinary methods of travel, to the very material disadvantage of both steam and surface railroads; and, as Charlotte is the popular summer resort of a thriving and populous city, it cannot be otherwise than that large numbers of wheelmen, during a considerable portion of the year, avail themselves of the side path which the plaintiff, at a large expense, has constructed for their accommodation. This being the case, it is quite reasonable, we think, in view of the coincidence to which allusion has just been made, to assume that to the act of 1898 may be attributed the falling off in the plaintiff's receipts. Just to what extent this reduction will impair the plaintiff's earning power does not satisfactorily appear, but, as its dividends have never exceeded 7 per cent., it is apparent, we think, that the loss of income from this source must necessarily be very large. This, however, is not the true measure of the effect of the act of 1898 upon the plaintiff's property rights; for it must be borne in mind that under the provisions of its charter the plaintiff's corporate existence will terminate in less than 12 years, and that in the meantime its bondholders, who have invested their money upon the faith of the rights and privileges secured by the act of 1882, are to be settled with. It is not difficult to see, therefore, that if the plaintiff's earning capacity has been reduced 25 per cent., as seems to be the case, it will probably require the greater part of its earnings in the future to meet obligations which are entitled to priority over the claims of stockholders. In this view of the case, which is by no means a strained or extreme one, it is impossible to resist

the conclusion that the plaintiff's property rights have been very materially interfered with by the action of the legislature in depriving it of one of its most profitable sources of income.

We come then to a consideration of the second and more serious question of legislative power, in determining which we are asked to say that its attempted exercise in the present instance is in contravention of the fundamental law of both the state and the nation. In attempting to discharge the delicate and responsible duty thus cast upon us, we are not unmindful of that very salutary rule of construction which requires that the validity of a statute must be determined, not by our ideas of natural justice and equity, but solely by constitutional restraints and provisions, and that nothing less than a clear and substantial conflict between its provisions and the fundamental law will justify its condemnation. In short, a violation of the constitution, like any other grave offense, must be proved beyond a reasonable doubt. As has been well said by an eminent jurist:

"Courts do not sit in review of the discretion of the legislature, or determine upon the expediency, wisdom, or propriety of legislative action in matters within the power of the legislature. Every intendment is in favor of the validity of statutes; and no motive, purpose, or intent can be imputed to the legislature, in the enactment of a law, other than such as are apparent upon the face, and to be gathered from the terms of, the law itself." Opinion of Allen, J., in People v. Albertson, 55 N. Y. 50–54.

But this rule, salutary though it be, is nevertheless subject to another which is equally potential; for it is one which constrains courts to heed the constitution, as the voice of the people speaking in their sovereign capacity, and to condemn without hesitation when substantial conflict is clearly established. In re New York El. R. Co., 70 N. Y. 327. In the present case, as has already been suggested, the conflict, if there is any, is a substantial one, and it only remains to determine whether the exercise of power attempted by the act of 1898 is excessive.

Prior to 1846 corporations were created by special acts of the legislature, but this policy was fraught with so much mischief, and gave rise to such continuous abuse, that in the convention of that year a radical change was effected, by incorporating into the organic law of the state this provision:

"Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes and in cases where in the judgment of the legislature the objects of the corporation cannot be attained under general laws." "All general laws and special acts passed pursuant to this section may be altered from time to time or repealed." Const. 1846, art. 8, § 1.

Thus, it will be seen that the power of repeal which the legislature attempted to reserve to itself in the general law of 1847 was not without apparent constitutional sanction; and this, at first blush, would seem to sustain the defendant's contention that any corporation created under that act might be deprived of its property and all the franchises acquired under its charter by mere legislative enactment,—in other words, that the legislature has reserved to itself the right of unlimited and unrestrained confiscation; for, if it has the power to deprive the plaintiff of the right

theretofore accorded it to exact toll for bicycles, it may with equal propriety deprive it of the right to exact toll for any or all of the vehicles specified in the act of 1882, and thus, under the guise of amendment or repeal, accomplish the absolute and total destruction of vested property rights. Such a proposition is too startling and subversive in its nature to receive our approval, and although the subject of the extent and limitation of legislative power in cases where corporate rights and property have been involved is one which has frequently engaged the attention of the courts, and is also one concerning which a great variety of views has been expressed, we are not aware of any case in which the doctrine of reserved power has been carried to the extent here contended for. Indeed, in a comparatively recent case, decided by the court of appeals of this state, where this very question was under consideration, it was said that:

"Whatever might have been the intention of the legislature, or even of the framers of our constitution, in respect to the effect of the power of repeal reserved in acts of incorporation, upon the property rights of a corporation, such power must still be exercised in subjection to the provision of the federal constitution; [and] we think that there are no reported cases in which the judgment of the court has ever taken the franchises or property of a corporation from its stockholders and creditors through the exercise of the reserved power of amendment and repeal." People v. O'Brien, 111 N. Y. 1, 36, 37, 18 N. E. 692.

This view of the question is by no means confined to the case just cited. On the contrary, it is one which has been advanced by text writers, and repeatedly enunciated by both state and federal courts. Judge Story, in his work on the Constitution, says:

"It may be laid down as a general principle that whenever a law is in its own nature a contract, and absolute rights are vested under it, a repeal of that law cannot devest those rights, or annihilate or impair the title so acquired;" and again: "A charter to a turnpike company is certainly a contract founded on a valuable consideration." Sections 1391, 1392.

In the case of Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622, it was held (page 344, 148 U. S., and page 633, 13 Sup. Ct.) that a franchise to exact toll "was as much a vested right of property as ownership of the tangible property."

In City of Detroit v. Detroit & H. P. R. Co., 43 Mich. 140, 5 N. W. 275, that distinguished jurist, Judge Cooley, in discussing a question similar to the one now under consideration, uses this language:

"There is no well-considered case in which it has been held that the legislature, under its power to amend a charter, might take from the corporation any substantial property or property rights."

The same principle was asserted in Thorpe v. Railroad Co., 27 Vt. 140. And in the Railroad Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 348, 349, 388, 391, 1191, the supreme court of the United States, speaking by Chief Justice Waite, declared that:

"Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward. Neither can it do that which in law amounts to the taking of private property for public use without just compensation, or without due process of law."

And this language has been cited with approval in a more recent decision of the same tribunal. Smyth v. Ames, 169 U. S. 523, 18 Sup. Ct. 418.

But, without multiplying citations of like import, it will be sufficient for our purpose to refer to but one other, and one which we believe is the latest deliverance of the supreme court of the United States upon this subject. In the case of Railway Co. v. Smith, 174 U. S. ——, 19 Sup. Ct. 565, Mr. Justice Peckham, in an elaborate opinion reviewing the various authorities in both the state and federal courts which bear upon the right of a state legislature, under its reserved power, to destroy or interfere with the property of a corporation which it had created, makes use of this significant language:

"Assuming that the state is not controlled by contract between itself and the railroad company, the question is, how far does the authority of the legislature extend in a case where it has the power of regulation, and also the right to amend, alter, or repeal the charter of the company, together with a general power to legislate upon the subject of rates and charges of all carriers. It has no right, even under such circumstances, to take away or destroy the property or annul the contracts of a railroad company with third persons."

It is not to be denied, however, that cases may be found which, upon a mere casual examination, would seem to support the defendant's contention that under this reserved power of amendment and repeal the state legislature may accomplish precisely what was attempted in the act of 1898; and the case of People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, upon which much stress is apparently laid, belongs to that class. It was there held that the act of the legislature of this state fixing the maximum charge for elevating grain, and making a violation of the act a misdemeanor, did not contravene the constitutional guaranty protecting private property. It will be discovered, however, upon a careful reading of the case, that the conclusion reached by the court was put upon the ground that the act in question was nothing more than a legitimate exercise of the police power of the state over a business affecting a public interest; and the court in its opinion was careful to say (page 27, 117 N. Y., and page 679, 22 N. E.) that:

"We rest the power of the legislature to control and regulate elevator charges on the nature and extent of the business, the existence of a virtual monopoly, the benefit derived from the canal, creating the business and making it possible, the interest to trade and commerce, the relation of the business to the prosperity and welfare of the state, and the practice of legislation in analogous cases. These circumstances, collectively, create an exceptional case, and justify legislative regulation."

And again, in the case of Mayor, etc., of New York v. Twenty-Third St. Ry. Co., 113 N. Y. 311, 21 N. E. 60, also cited by the learned counsel for the defendant, it was simply held that while, under its reserved power, the legislature may not deprive a corporation of its property, it may enlarge or limit its power, and increase or limit its burdens, to any extent consistent with the scope and objects of the corporation as it was originally constituted. In that case it seems that, as a condition of granting a

franchise to the defendant, a surface railroad, the city of New York had exacted a license fee for each car used for the conveyance of passengers, "but on further consideration the legislature concluded that it would be more convenient and beneficial to the city, and a fairer measure of the compensation which should be received, if a percentage on the gross receipts should be paid." Page 318, 113 N. Y., and page 62, 21 N. E. The effect of such an enactment was not to deprive the corporation of its property. It was merely a readjustment of its relation to the municipality from which it obtained its franchise. And while the terms of such readjustment were different, and quite possibly more burdensome than those originally imposed, it was clearly competent for the legislature, in the exercise of its power of regulation, to determine what they should be.

But it is said that the authority of the legislature to annul or repeal a corporation organized under the general law may be measured by the reasonableness of the attempt in each particular case. If this be true, the question at once suggests itself, upon what basis is the reasonableness of the enactment to be determined? In the present instance the toll exacted for the use of the plaintiff's road by wheelmen was certainly not exorbitant, nor does it appear that any complaint in regard thereto was ever made by any one. On the contrary, the reduction in the rate from five to three cents for the round trip was accomplished by a written agreement entered into between the plaintiff and the president of the League of American Wheelmen, and was therefore presumably satisfactory to all concerned. Shortly thereafter, however, the legislature, arbitrarily, and without any apparent reason therefor, attempted to exempt wheelmen, as a class, from the necessity of paying any toll whatever. It would seem, therefore, that, even when measured by the standard of "reasonableness," the enactment of 1898 was not a valid exercise of "reserved power"; for, to quote once more from the opinion in the case of Railway Co. v. Smith, supra:

"The power of the legislature to enact general laws regarding a company and its affairs does not include the power to compel it to make an exception in favor of some particular class in the community, and to carry the members of that class at a less sum that it has the right to charge for those who are not fortunate enough to be members thereof. This is not reasonable regulation. * * * The authority to legislate in regard to rates comes from the power to prevent extortion or unreasonable charges or exactions by common carriers or others exercising a calling, and using their property in a manner in which the public have an interest."

In view of this and other authoritative statements of the rule by which we must be governed in our decision of the important questions involved in this case, it would seem impossible to reach any other conclusion than that, whether the plaintiff's franchise be regarded as in the nature of a contract, or simply as property, the attempt on the part of the legislature to interfere therewith was an invalid exercise of power; for in the one case its necessary effect was to impair a contract, while in the other its tendency was to deprive the plaintiff of its property rights without due process of

law, and in either case it was a violation of clearly defined constitutional limitations.

The judgment appealed from should therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except HARDIN, P. J., dissenting.