(107 App. Div. 470.)

HINCKLEY v. SCHWARZSCHILD & SULZBERGER CO. et al.

(Supreme Court, Appellate Division, First Department. September 29, 1905.)

1. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—CORPORATIONS—AMEND-
MENT OF ACT OF INCORPORATION—RESERVED POWER.

Legislative acts regulating the internal management of a corporation, so far as it has reference to the public and concerns the policy of the state, are within the reserved power to alter and repeal the charter granted to a corporation, though the exercise of the power adds to the burden of the stockholder by increasing his liability, diminishing the value of the stock, or changing the name, offices, or proportion in the management of the corporation.

2. SAME—RETROACTIVE OPERATION OF STATUTES.

Laws 1901, p. 969, c. 354, authorizing domestic corporations to issue preferred stock by consent of the holders of two-thirds of the capital stock, is within the reserved power of the Legislature to alter the charter of a corporation, and authorizes a corporation to issue preferred stock by consent of the holders of two-thirds of the capital stock, though at the time of the organization of the corporation, Laws 1892, p. 1837, c. 688, § 47, authorizing corporations to issue preferred stock by the unanimous consent of the stockholders, was in force; the statute not interfering with vested rights.

Appeal from Special Term, New York County.

Action by Sylvester B. Hinckley against the Schwarzschild & Sulzberger Company and others. From a judgment for defendants (91 N. Y. Supp. 893), plaintiff appeals. Affirmed.

Argued before O'BRIEN, P. J., and HATCH, PATTERSON, and LAUGHLIN, JJ.

E. P. Ufford, for appellant.
H. Miller, for respondents.

HATCH, J. It is sought by this action to restrain the defendant corporation from issuing preferred stock and subordinating its existing stock, issued at the time of its organization, to the payment of capital and dividends thereon. The complaint avers that the defendant corporation was organized on January 30, 1893, under the business corporation law, as amended by chapter 691, p. 2042, of the Laws of 1892; that the plaintiff is the owner of 425 shares of its capital stock; that the certificate of incorporation provided for the issuing of common stock only, divided into 50,000 shares, of the par value of $100 each; that the 425 shares held by the plaintiff were issued thereunder; that no preferred stock was provided for or authorized, and that, under the law as it existed at the time of the organization of the defendant corporation and the issuance to the plaintiff of his shares of stock, no preferred stock could be issued, except by a unanimous vote of all the stockholders; that the defendant corporation has announced its intention forthwith to issue $5,000,000 of preferred stock, with cumulative preferential dividends at the rate of 7 per cent. per annum, payable quarterly, and having a preference over the common stock, both as to capital and dividends; that such proposed issue is against the protest of the plain-

tiff and several other stockholders; and that the plaintiff will suffer serious and irreparable injury, if such issue of preferred stock be permitted. The answer admits, by not denying, the proposed increase and character of the stock, and it avers that the proposed issue was authorized by over 90 per cent. of the stock held by the shareholders.

There is no dispute as to the facts. It was stipulated that the case should be tried upon the pleadings, and that the averments of the complaint should be taken as true, except where they were denied by the answer, in which case the averments of the answer should be considered as true. In addition to the facts set out in the pleadings, it was stipulated that the proceedings to issue the stock were taken under the law of 1901, "that there was not unanimous consent, but consent by the holders of 39,343 shares against the opposition of the holders of 2,254 shares." The law in existence at the time of the organization of the corporation in respect to the character of the stock which might be issued by it provided as follows :

"Every domestic stock corporation may have preferred and common stock, and different classes of preferred stock, if the certificate of incorporation so provides, or by the unanimous consent of the stockholders, and may, upon the request of the holder of any preferred stock, by a two-thirds vote of its stockholders, exchange the same for common stock, and issue certificates for common stock therefor, share for share, or upon such other valuation as may have been agreed upon in the scheme for the organization of such corporation, or the issuance of such preferred stock, the total amount of such capital stock shall not be increased thereby." Laws 1892, p. 1837, c. 688, § 47.

By chapter 354, p. 969, of the Laws of 1901, the above-quoted section was amended by providing:

"Every domestic stock corporation may issue preferred stock and common stock and different classes of preferred stock, if the certificate of incorporation so provides, or by the consent of the holders of record of two-thirds of the capital stock, given at a meeting called for that purpose upon notice such as is required for the annual meeting of the corporation."

The amendment to the law confers the right upon two-thirds of the stockholders to authorize the issue of preferred stock. It was within the power of the Legislature to provide for the issuing of such stock in the charter of the corporation, or, if the existing law at the time of its organization had provided therefor, it would have been deemed to be a part of the charter of the corporation and the issue thus authorized by law. The amendatory act, providing for the issuance by a two-thirds majority of the stock, is a sufficient authority for the proposed issue, if such provision of law be held to operate upon all corporations in existence at the time of its passage. Whether the law can so operate is the only question presented by this case.

It was established in Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629, that a charter from the state to a private corporation created a contract, and that the Constitution of the United States, which forbids any state passing any law impairing the obli-

gation of contracts, prevented a change by legislative enactment of the charter so issued. It was feared that the operative effect of such holding would be to build up corporate power, which might become so strong as to be a menace to the exercise of governmental powers. To forestall such result, nearly all of the states of the Union have provided, either by statute or constitutional provision, a limitation upon corporate power by reserving the right to alter or repeal the charter granted to any corporation. Such is the provision of the Constitution of this state (Const. art. 8, § 1), and it had also been the subject of constitutional provision and statutory enactment for a long time prior to the existence of the present Constitution. Does this legislation, therefore, fall within the reserved power of the Legislature to alter or repeal? If it does, the proposed issue of stock is authorized by law. If it does not, there is no authority therefor, save upon the consent of all the shareholders.

The question thus presented is important to the last degree, and there is much truth in the claim that up to this time the subject has not been considered with that degree of care which its importance deserves. It has been argued with great force that the Legislature, under the reserved power to alter and repeal, has no authority to enact laws affecting the property and rights of a corporation not provided for in the contract of its creation; that the exercise of such powers contravenes the provisions of the federal Constitution, and that to hold otherwise operates as a creation by the Legislature of a new and distinct power; and that in granting the right to individuals to become a corporation the only power reserved by the state to alter and repeal, so far as property and contract rights are concerned, is such only as might be reserved by a private party; that the state contracts in such capacity and does not act as a sovereign exercising governmental functions. Such doctrine seems to find support in Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162, and also in the Dartmouth College Case. The logical result of this claim, however, leads directly to the conclusion that, in so far as the franchise to be a corporation is concerned, and over the exercise of such powers as can only be exercised by its possession, the state control under the reserved power is absolute. This is the express holding in Mayor v. Twenty-Third St. Ry. Co., 113 N. Y. 311, 21 N. E. 60. The power thus reserved is not only vast in extent, but is in many respects alarming. As it rests in the legislative will to repeal the charter of a corporation and destroy its life, so it may prescribe such conditions as it chooses to the continued enjoyment of its franchise. It is readily seen that by means of this control the Legislature may regulate any and all affairs of a corporation through the simple medium of conditioning its right to exist as a corporation.

This conclusion would seem to follow as a logical deduction from the power reserved. And yet courts have declared that the power is not absolute and unlimited, and in several instances have restrained its exercise. Thus in Rochester v. C. T. R. Co. v. Joel, 41 App. Div. 43, 58 N. Y. Supp. 346, the Legislature prohibited the plaintiff from

exacting tolls on bicycles passing over its road.  The court held the
law unconstitutional, on the ground that it took from the company a
vested property right, but the authority to take was derived from the
franchise granted by the state.  It could take no tolls without it, and
concededly the state has control of such subject under the reserved
power.  So, in People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A.
255, 7 Am. St. Rep. 684, the Legislature dissolved the Broadway Sur-
face Railway Company under its reserved power so to do.  The ques-
tion arose whether the franchise to maintain tracks and operate cars on
Broadway and the mortgages which had been given survive the dis-
solution.  The court held that they did.  Clearly, if the Legislature
had power to repeal the franchise which it had granted, as conceded-
ly it had, owners and incumbrancers would seem to have taken their
rights subject to the exercise of the power and with notice of the
tenure under which the franchise was held.  It was evidently not
the logic of the situation which controlled the judgment of the court.
It was the seeming injustice to the security holders which would
have resulted, had the power reserved been strictly enforced without
qualification.  The limitations of an opinion do not permit, in view
of existing authorities, a more extended discussion of the principles
which underlie the subject.  A very able argument upon the subject
is to be found in an article recently published by Prof. Horace Stern,
Fellow of the Department of Law of the University of Pennsylvania,
on "Limitations of the Power of the State under a Reserved Right
to Amend or Repeal Charters of Incorporation."  Were the question
now before us an original one, I should be more than inclined to
adopt the argument presented by Prof. Stern.  The large preponder-
ance of authority, however, both in the federal courts and in the
courts of this state, as well as in other states, are opposed to his con-
clusions, not alone upon the subject of the right of the Legislature to
repeal a franchise, and its effect upon property owned by the corpo-
ration, but also with respect to the authority of the state to regulate
the internal affairs of corporations under its reserved power.  The
last question is one presently important in the disposition of this
appeal, and an examination of the authorities seems to justify the con-
clusion reached by the learned trial court.

It was said, in Looker v. Maynard, 179 U. S. 46, 21 Sup. Ct. 21, 45
L. Ed. 79, that the effect of this reservation was to leave in the Leg-
islature "the power to make any alteration or amendment of a char-
ter subject to it, which will not defeat or substantially impair the ob-
ject of the grant, or any right, vested under the grant, and which the
Legislature may deem necessary to carry into effect the purpose of
the grant or to protect the rights of the public or of the corporation,
its stockholders or creditors, or to promote the due administration
of its affairs."  It is evident that the present legislation does not de-
feat or impair the object of the grant.  It cannot be said that it does
not seek to carry into effect the purposes of the grant and in the or-
derly course of administration of the affairs of the corporation, pros-
ecuted in good faith, it cannot be said that the issue of preferred

stock is not for its benefit.   As the law is general, and applies alike to all stock corporations, it may be deemed to exhibit the public policy of the state with respect thereto, and therefore its adoption indicates ·a legislative intent to promote the public good in connection with the administration of the affairs of corporations to which its provisions are applicable.   The case would therefore seem to be brought within the legislative power in every aspect, unless its enforcement upon corporations existing prior to its passage can be said to interfere with contract or vested rights.   If it does, then it would not be authorized.

It is said that it interferes with such rights, and therefore can have no application to this corporation.   In Matter of Lee's Bank of Buffalo, 21 N. Y. 9, there was presented a condition where certain stockholders of the bank had subscribed and paid for the shares held by them upon the agreement, contained in its articles of association, that such shareholders should not be individually liable for the payment of the debts of the corporation.   The charter was subject to the right to alter or repeal by a clause in the Constitution of 1846, and also in the statutory law of the state as it existed prior to that time.   After the organization of the corporation a provision of law went into effect making the shareholders of banking corporations liable for the debts of the bank to the extent of their holding of shares of stock.   It was held that this legislation fell within the reserved power to alter or repeal, and that the imposition of liability for debts upon the shareholders did not operate to interfere with either a vested or contract right, and was therefore within the legislative power.   This case, upon appeal to the Supreme Court of the United States, was affirmed sub nom. Sherman v. Smith, 1 Black, 587, 17 L. Ed. 163.   These authorities have been uniformly followed in this state, and they seem to establish that the imposition by the Legislature upon shareholders of additional obligations not within the terms of the contract under which they subscribed and paid for their stock did not interfere with either a contract or a vested right.

It is said, however, that the effect of the provision is radically to change the character and value of the original stock by subordinating it to the preferred issue, and therefore to lessen its value and change its condition.   This contention seems to be inconsistent in principle with the discussion in Buffalo & N. Y. City R. Co. v. Dudley, 14 N. Y. 347.   It was there held that it was no answer to an action to enforce a subscription for stock of a corporation that there had been an alteration by the Legislature of the company's charter, whereby its name had been changed, its capital increased, and an additional extension of its road authorized, in consequence of which the stock had become less valuable to the defendant than it was at the time when he made his subscription, that all of these acts were within the legislative power, and that the diminution in value of the stock created thereby did not relieve from liability for the subscription.   This holding proceeded upon the general ground that it was

part of the contract that such acts might be done. To the same effect is Schenectady & Saratoga Plank Road Co. v. Thatcher, 11 N. Y. 102.

It is further urged that the proposed issue creates an inequality in the shares of stock, and is, therefore, not authorized. This contention seems also to be answered by authority. In Atty. Gen. ex rel. Dusenbury v. Looker, 111 Mich. 498, 69 N. W. 929, it appeared that, after the Michigan Mutual Life Insurance Company had been chartered and was engaged in business, the Legislature of Michigan passed an act authorizing minority stockholders, in order to secure representative membership in the boards of directors, to cumulate their shares upon one or more candidates, and, when cast, to multiply the votes by the number of directors to be elected. In that case there were nine directors, and the relator multiplied the number of shares which he voted by nine, and by dividing the same was enabled to elect two directors. The Supreme Court of Michigan held that this was valid legislation within the reserved power of the state, and that it interfered with no vested right. Upon appeal to the Supreme Court of the United States (sub nom. Looker v. Maynard, supra) the holding was sustained. This act created an inequality in the voting power of the stock. The fact that it was permissive only, and that all of the stockholders had an equal right to vote and to cumulate their votes, does not vary the result. No matter how the votes were cast, no added power was given to any stockholder, unless he was in a minority. If the vote was equal, there could be no multiplication. If unequal, the majority was denied any right in this respect while the minority exercised it. Equality in voting power of stock represents valuable rights and privileges quite as important as any other equality created in shares of stock. Smith v. A., T. & S. F. R. R. Co. (C. C.) 64 Fed. 272. It must therefore be regarded as settled that the mere working of inequality in shares of stock does not avail to defeat either a vested or a contract right.

In Hale v. Cheshire R. R. Co., 161 Mass. 443, 37 N. E. 307, there was a consolidation of two railroads authorized by the Legislature upon terms whereby the stockholders of each railroad surrendered their shares of stock and received in exchange therefor certain shares of the consolidated company. It was held that such exchange, having been authorized by the Legislature under its reserved power to alter and repeal, was binding upon the stockholders, and that a dissenting stockholder could not claim better terms than a majority of the stockholders of each company, acting in good faith, voted to give and take. The interference here with vested and contract rights would seem to have been quite radical. The right of the Legislature, however, was supported upon the ground, evidently, that the dissenting stockholder held his stock subject to the reserved right of the Legislature to make this change, that it was a part of the contract under which he held, and therefore that there was no interference with either vested or contract rights.

In varying form the principle announced in these decisions has received uniform support in the courts of this state (Hyatt v. Esmond, 37 Barb. 601; Union Hotel Co. v. Hersee, 79 N. Y. 454, 35 Am. Rep. 536; People ex rel. Kimball v. B. & A. R. R. Co., 70 N. Y. 569; People v. O'Brien, supra; Grobe v. Erie Co. M. Co., 39 App. Div. 183, 57 N Y. Supp. 290, affirmed on opinion below 169 N. Y. 613, 62 N. E. 1096); also by the Supreme Court of the United States (Holyoke Co. v. Lyman, 15 Wall. 500, 21 L. Ed. 133; Close v. Glenwood Cemetery, 107 U. S. 466, 2 Sup. Ct. 267, 27 L. Ed. 408; Wright v. Minn. M. L. I. Co., 193 U. S. 657, 24 Sup. Ct. 549, 48 L. Ed. 832); and in other states and federal courts (New Haven & D. R. R. Co. v. Chapman, 38 Conn. 56; Harper v. Ampt, 32 Ohio St. 291; Gregg v. G. M. & S. Co., 164 Mo. 616, 65 S. W. 312; Berger v. U. S. Steel Corpn., 63 N. J. Eq. 809, 53 Atl. 68; McKee v. Chautauqua Assembly, 130 Fed. 536, 65 C. C. A. 8; C. H. Venner Co. v. U. S. S. Corp. [C. C.] 116 Fed. 1012). These cases would seem to authorize the conclusion that acts which do no more than regulate and control the internal management of a corporation, so far as it has relation to the public and concerns the policy of the state, are within the power to alter and repeal, even though the exercise of the power adds to the burden of the stockholder by increasing his liability, or diminishes the value of his stock, or changes the name, offices, or proportion in management and control of the corporation. Within this power, under this rule, must necessarily fall the right to change the capital stock of the corporation as to amount, kind, and classification. In effect it must be deemed to exhibit the policy of the state adopted to promote the corporate purpose, enhance its welfare, and extend its business.

In R. & B. R. R. Co. v. Thrall, 35 Vt. 536, the precise question was involved. Therein it was held that an issue of preferred stock subordinating the common thereto in payment, when authorized by the Legislature, was to be upheld, upon the ground that it was a provision mainly for the object of raising money for the purposes of the corporation. If this doctrine is to be applied, the present act is applicable to this corporation. It is not contended that the corporation would not have the power, if authorized by the Legislature, to borrow money upon mortgage, and to issue bonds. The effect of such a proceeding would be to subordinate the shares to the payment of the bonds and the mortgage, and might seriously impair, if not destroy, the value of the stock. Even though such was the result, an act of the Legislature authorizing it would be valid. To the same effect are Curry v. Scott, 54 Pa. 270; Everhart v. W. C. & P. R. R. Co., 28 Pa. 339; W. C. & P. R. R. Co. v. Jackson, 77 Pa. 321; 3 Clark & Marshall on Private Corporations, p. 1924, § 631e, and cases cited; 1 Cook on Corporations (5th Ed.) § 268; City of Covington v. C. & C. B. Co., 73 Ky. (10 Bush) 69.

The distinction which exists between issuing an obligation of the corporation for the purpose of borrowing money and issuing preferred stock for the same purpose is that in the latter the charge upon incomes is made perpetual, while in the former it may be discharged

by payment. This difference, however, does not militate against the fact that resort may be had to an issue of preferred stock for the purpose of raising money, and that it is practically effectual for such a purpose. The power invoked, treated as a mere method of raising money, is not different from that which authorizes borrowing money in any other form. As we have already seen, the imposition of an additional obligation, the extension of corporate purpose whereby the value of the stock is impaired, and creating inequality in shares of stock, have all been supported as a valid exercise of legislative power, which does not infringe upon vested rights or rights of contract. It cannot be gainsaid but that the issue and sale of preferred stock is a method by which money can be raised, and, when authorized by law, is a perfectly legitimate method of providing a corporation with funds, and, it may be added, is frequently resorted to. The corporation receives the benefit of the money, the proceeds of the preferred stock. In this increment the holders of the common stock share equally, and each holder of the common stock stands upon an equal plane in respect thereto. It may not be the best method of raising money; but, when authorized by law, it certainly is a method which the corporators may use, and no stockholder would have ground for complaint. Whether it be usually resorted to for such purpose or not is quite beside the question. That is one of power; and, if that exist, whether the method be good or bad is not of consequence.

Nor is Kent v. Quicksilver Mining Co., 78 N. Y. 159, an authority against the validity of this act. The court there considered the effect of a by-law authorizing an issue of preferred stock, and it was held that, under the circumstances of that case, such by-law was void as being unreasonable, even though there was authority conferred by law to amend, alter, and repeal. Therein the court said:

"We will not say, for we are not called upon here to say, that never can a corporation rightfully, against the dissent of a portion of its stockholders, make some of the stock preferred. What we assert is that this case does not present a state of facts in which such a power so to do exists."

It refers to and distinguishes the case of Rutland R. R. Co. v. Thrall, 35 Vt. 545, upon the ground that there existed in that case legislative authority for its action. Whether the distinction be good or not, it is the fact that the decision related to the rights of the stockholders as between themselves, and did not involve the power of the Legislature to interpose in the management and regulation of the internal affairs of corporations. The authorities which we have cited seem to regard this distinction of importance. In Matter of Lee's Bank of Buffalo, supra, there would doubtless have been no power in the individual corporators, as between themselves, to impose upon the shareholders a liability for the debts of the bank. Such an attempt would have been in direct violation of the terms of the contract made between themselves. But the power of the state to regulate and control within its reserved power met with no such obstacle; and clearly, if the Legislature had the right to in-

terpose its mandate in such a case, it must follow that mere interference with rights secured by contract, as between individual incorporators and stockholders, is no answer to the right of the state, in the interest of the public good and in the regulation of private corporations by general law, to exercise such right under the reserved power.

Nor is Campbell v. A. Z. Co., 122 N. Y. 456, 25 N. E. 853, 11 L. R. A. 596, opposed to this view. Therein there was no legislative authority interposed, and it was held, upon the authority of Kent v. Quicksilver Mining Co., supra, that under such circumstances and in the absence of statutory authority there could be no agreement between the shareholders by which a preference could be given to some without the consent of all. In Martin v. Remington-Martin Co., 95 App. Div. 18, 88 N. Y. Supp. 573, this question was not involved; but, so far as its general reasoning is concerned, it is in harmony with the views herein expressed.

We reach the conclusion, therefore, that this act is a valid exercise of legislative power, and that it applies to corporations existing at the time of its passage. It follows that the judgment should be affirmed, with costs. All concur.

PATTERSON, J.  I coucur with Mr. Justice HATCH in the conclusion at which he has arrived in this case, being compelled to do so, as he was, by the weight of authority.